**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 10, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ROXANNE MOFFITT PIGNANELLI,

Plaintiff-Appellant,

v.

PUEBLO SCHOOL DISTRICT NO.
60, DR. JOYCE F. BALES,
individually and in her capacity as
Superintendent of Pueblo School
District No. 60, and KATHLEEN
KENNEDY, individually and in her
capacity as President of Pueblo School
District No. 60's Board of Education,

Defendants-Appellees.

No. 07-1251

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 1:05-CV-01682-RPM-CBS)**

---

James A. Carleo, Pueblo, Colorado, for the Plaintiff-Appellant.

Elliot J. Scott (Sonja S. McKenzie with him on the brief), Senter Goldfarb &
Rice, L.L.C., Denver, Colorado, for the Defendants-Appellees.

---

Before **KELLY**, **TYMKOVICH**, Circuit Judges, and **FRIZZELL**, District
Judge.[*]

---

[*] Honorable Gregory K. Frizzell, United States District Court, Northern
District of Oklahoma, sitting by designation.

**TYMKOVICH**, Circuit Judge.

Roxanne Moffitt Pignanelli ran for the Pueblo School District Board of Education in 2003 but lost the election. A middle school drama teacher at the time, she blamed her employer, Pueblo School District No. 60, for her loss, and sued under 42 U.S.C. § 1983 for alleged violations of her constitutional rights. Pignanelli claimed the school district and its representatives, including the superintendent of schools, violated the First Amendment, Equal Protection Clause, and Due Process Clause by causing her to lose the school board election and then failing to renew her one-year teaching contract.

The district court granted summary judgment in favor of the Defendants on all claims, and Pignanelli appealed. We agree with the district court that the Defendants are entitled to summary judgment. Exercising jurisdiction under 28 U.S.C. § 1291, we therefore AFFIRM.

## I. Factual Background

Viewed in the light most favorable to Plaintiff-Appellant Pignanelli, *see Clanton v. Cooper*, 129 F.3d 1147, 1153 (10th Cir. 1997), the facts as alleged establish the following.

The school district hired Pignanelli in August 2002, to serve as a middle school drama teacher under a one-year contract. District Deputy Superintendent John Musso negotiated with Pignanelli for her salary and benefits package, and

ultimately placed Pignanelli into a higher pay grade than her educational qualifications and teaching experience supported at the time. Despite this discrepancy, the contract was approved by the school board and Pignanelli began her tenure as a part-time teacher in the district. In August 2003, Pignanelli was rehired, again under a one-year contract, to continue in the same position.

A week after her rehiring, Pignanelli announced her candidacy for the upcoming school board election. One of the issues that developed in the campaign was whether District Superintendent Joyce Bales should be removed. Pignanelli was perceived by some, including Bales, as a Bales-opponent—and someone who would vote for Bales's removal. Because of this perception, Bales sought to discredit Pignanelli's candidacy and cause her to lose the election. Bales did this by combing through Pignanelli's personnel file, and then initiating a school board review of her salary and qualifications. On September 23, 2003, at a confidential executive session of the board, Pignanelli's salary was reduced to the level her experience and education supported.

Soon after the executive session, *The Pueblo Chieftain*, a local newspaper, reported Pignanelli's salary reduction. One of the reporters for the *Chieftain* made a request under Colorado's Open Records Act for Pignanelli's personnel records, which were duly handed over by the board. These records were then made public through publication in the *Chieftain*. At the same time, both Pignanelli and Superintendent Bales were interviewed by the newspaper for

additional, related stories. The controversy over Pignanelli's salary and her concomitant candidacy for the school board fed into several stories in the local media up through the election day in November 2003. At the election, the voters chose not to elect Pignanelli.

Despite her election defeat, Pignanelli maintained her position as a part-time teacher through the end of the 2003–2004 school year. At the end of the year, Pignanelli's part-time drama spot was changed to a full-time language arts, speech, and drama position. Pignanelli was not qualified for this new position, and was not hired for it. As she had been working under a one-year contract, the district had no contractual obligation to rehire her.

Based on her failure to obtain office and the loss of her part-time teaching position, Pignanelli determined her constitutional rights had been violated. She therefore brought suit under § 1983 against the school district, Superintendent Bales, and the president of the school board. The district court granted summary judgment to all three Defendants.

## II. Discussion

We review the district court's grant of summary judgment *de novo*. *Seegmiller v. LaVerkin City*, 528 F.3d 762, 766 (10th Cir. 2008). Summary judgment should only be granted where, taking the facts in the light most favorable to the non-moving party, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Id.*; Fed. R. Civ. P.

56(c). Although the burden is on the moving party, the non-movant "may not rest on its pleadings," but rather must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).

Pignanelli appeals the district court's grant of summary judgment in favor of Defendants on all the claims she raised in the district court. Interpreting her briefing as best we can, Pignanelli alleges she can overcome the summary judgment hurdle on her claims alleging (1) violations of due process, (2) First Amendment employment retaliation, and (3) violations of equal protection. We conclude Pignanelli has waived review of her due process claim by failing to cite any legal authority for the claim in her appellate brief, waived review of her First Amendment retaliation claim by failing to argue it in the district court, and cannot obtain relief on her equal protection claim because it fails on the merits.

*A. Due Process*

Pignanelli has waived appellate review of any due process claim she may have alleged against the Defendants in the district court. Although Pignanelli asks us to reverse the grant of summary judgment in favor of Defendants, she must do more than simply request reversal for us to consider the merits of her claim. *See* Fed. R. App. P. 28(a); *Becker v. Kroll*, 494 F.3d 904, 913 n.6 (10th Cir. 2007) ("An issue or argument insufficiently raised in the opening brief is

deemed waived."). Rule 28(a) of the Federal Rules of Appellate Procedure requires the appellant to set forth "appellant's contentions and reasons for them, with citations to the authorities and part of the record on which the appellant relies." Fed. R. App. P. 28(a)(9)(A). Because Pignanelli has not directed us to any legal authority or record evidence supporting a claim for relief under the Due Process Clause of the Fourteenth Amendment, her appeal on this ground must fail.

### B. *First Amendment Employment Retaliation*

As with her due process claim, we will not consider the merits of Pignanelli's First Amendment employment retaliation claim. Pignanelli argues for the first time on appeal that she meets the four-step analysis, set forth in *Dill v. City of Edmond*, for public employees asserting a claim of retaliation for exercising their First Amendment rights. *See Dill v. City of Edmond*, 155 F.3d 1193, 1201–03 (10th Cir. 1998) (citing *Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)). Under *Dill*, if the public employee's speech involves a matter of public concern, we must balance his or her interest in commenting on such matters against the interest of the government employer in an effective, non-disruptive work environment. *Id.*

By failing to argue *Dill* in the district court, however, Pignanelli has waived review of the issue in this court. We do not review claims on appeal that were not presented below. *Wolfe v. Barnhart*, 446 F.3d 1096, 1103 (10th Cir.

-6-

2006); *Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc.*, 413 F.3d 1163, 1167 (10th Cir. 2005). Pignanelli failed to allege the requirements for a First Amendment employment retaliation claim in her district court complaint, summary judgment briefing in the district court, or at the hearing held by the district court. In fact, as Pignanelli made clear in her summary judgment briefing, the basis of her First Amendment challenge was her election loss—not employment retaliation. *See* Supp. App. at 35 (Pl.'s Resp. Br. at 1) ("This is a First Amendment case about the Defendants' hijacking a school board election."); *id.* at 66 (Pl.'s Resp. Br. at 32) ("Plaintiff's First Amendment claim revolves around her status as a candidate running for the D-60 board of education. Her claim is that the Defendants disclosed confidential information about her to the media, sabotaging and destroying her candidacy.").

Because Pignanelli failed to argue her First Amendment employment retaliation claim below, the district court did not have an opportunity to address the claim and we will not consider it for the first time on appeal.

*C. Equal Protection*

Finally, Pignanelli—essentially repackaging a First Amendment speech right claim—argues two distinct harms were inflicted upon her in violation of the Equal Protection Clause. She complains of (1) her loss in the school board election in November 2003, and (2) her loss of salary and position as a teacher at Pueblo School District No. 60 after the 2003–2004 school year. Both harms, she

-7-

asserts, result from the Defendants' "intentional or purposeful discrimination . . . design[ed] to favor one individual or class over another." Aplt. Br. 30. To put it another way, Pignanelli asserts the Defendants violated the Equal Protection Clause by treating her differently than similarly situated individuals (presumably other district employees) during her run for elected office and in her position as a teacher in the district.

After carefully considering the applicable law, we reject both of the separate, but overlapping grounds Pignanelli says support her equal protection cause of action. First, the three cases she cites in the context of her election loss are so factually distinguishable as to provide no support for a cause of action tied to the loss. Second, clear Supreme Court precedent precludes a public employee from making out an equal protection claim on the sole basis that she was treated differently by her employer.

*1. Election Loss*

Pignanelli alleges the Defendants violated the Constitution because they "engaged in an effort to defeat her." Aplt. Br. 29. She complains that Superintendent Bales leaked information to *The Pueblo Chieftain* in a manner that "suggested an improper, if not salacious, relationship" between her and Deputy Superintendent Musser and "destroyed Ms. Pignanelli's candidacy." Aplt. Br. 20,

8.[1]  Because of Bales's opposition to her candidacy, Pignanelli argues, she did not have a fair chance of winning the election.

A review of the three election cases Pignanelli cites reveals the obvious deficiency in her claim.  In fact, the cases she relies upon—*Snowden v. Hughes*, 321 U.S. 1 (1944); *Smith v. Cherry*, 489 F.2d 1098 (7th Cir. 1973) (per curiam); *Shakman v. Democrat Org. of Cook County*, 435 F.2d 267 (7th Cir. 1970)—are not even in the same factual universe.  While each of those cases dealt with election irregularities perpetrated by state election officials, here we have a case dealing only with public school officials opposing Pignanelli's candidacy.

In *Snowden v. Hughes*, for example, the facts painted a picture of violations of state election law by the officials charged with administering it.  There, petitioner alleged "members of the [Illinois] State Primary Canvassing Board, acting as such but in violation of state law, have . . . deprived petitioner of nomination and election as representative in the state assembly."  321 U.S. at 5.  The petitioner argued the defendants, "by failing to certify petitioner as a duly elected nominee, ha[d] denied to him a right conferred by state law and ha[d] thereby denied to him the equal protection of the laws secured by the Fourteenth Amendment."  *Id.* at 8.  The case was about access to the ballot, the right to a

_____

[1]  Despite her characterization of Defendants' conduct, Pignanelli did not bring state law claims of libel, defamation, or invasion of privacy against them.

meaningful vote, and the legitimacy of an election that was administered by state election officials in violation of state law.

The Seventh Circuit cases relied upon by Pignanelli were also based upon alleged misdeeds by state officials that called into question the legitimacy of an election. *See Smith*, 489 F.2d at 1102–03 (reversing grant of motion to dismiss where an alleged conspiracy by Illinois Democratic committeemen to run a sham candidate "debased the rights of all voters in the election"); *Shakman*, 435 F.2d at 268 (reversing grant of motion to dismiss where city and county officials allegedly "require[d] city and county employees, as a condition of holding their jobs . . . , to furnish votes, campaign work, and money to elect candidates chosen by the regular democratic organization").

The factual differences between the election cases cited by Pignanelli and her own case are vast—and illustrate the weakness of her legal theory. First, the school district Defendants were not election officials in control of an election; they were public school employees. The Defendants had no control over who got on the ballot or who received votes in the election. Second, Pignanelli was not prevented from actually running for office or receiving votes in an election. She persevered during the campaign, remaining on the ballot and receiving some share of the votes at the polls. Third, Pignanelli makes no allegation of election irregularities or illegalities. The school board election, by all accounts, was fairly

run, and voters had a real choice between real candidates. *Cf. Smith*, 489 F.2d at 1103 (reversing motion to dismiss because of a "sham candidacy").

Finally, any injury suffered by Pignanelli resulted from the voters not electing her rather than the Defendants' alleged misdeeds in trying to defeat her. The school district voters—not the Defendants—directly caused Pignanelli's election loss. *Cf. Habecker v. Estes Park*, 518 F.3d 1217, 1224 (10th Cir. 2008) (concluding plaintiff-appellant Habecker lacked standing to sue public officials in Estes Park because he "cannot show the existence of a case or controversy. His loss of elected office, although an injury in fact, was the result of an intervening cause—the electorate—and is not fairly traceable to the defendants.").

Pignanelli argues for the adoption of a rule that would subject public employees to liability whenever they speak in favor of or against a candidate for office. But this rule has no basis in the Equal Protection Clause; and further, runs directly contrary to the intent of the First Amendment. *See, e.g.*, *Connick*, 461 U.S. at 145 ("The First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." (internal quotation marks omitted)). The Constitution cannot be used to completely muzzle public employees during elections, nor to entirely protect them, when they become candidates, from the rough-and-tumble of the political arena. *See generally* Ivan E. Bodensteiner and Rosalie Berger Levinson,

1 State and Local Gov't Civ. Rights Liab. § 1:10 (Apr. 2008) (collecting cases). After all, "[p]olitics ain't bean bag."[2]

Finally, it is worth noting all the information disclosed by the Defendants to *The Pueblo Chieftain* was public information. The only documents disclosed were Pignanelli's resume, job application, and a memorandum written by Musso calculating her salary. At oral argument, Pignanelli conceded that under Colorado law the school board was required to disclose these documents upon request. *See* Colorado Open Records Act, Colo. Rev. Stat. § 24-72-201, *et seq.* (2003). Board members were similarly free to give the newspaper certain information stemming from their executive session. Although Colorado law says the record of executive sessions is not open to public inspection, it goes no further than that. *See* Colo. Rev. Stat. § 24-6-402(2)(d.5)(I)(D) (2003). In short, Pignanelli has failed to show the Defendants acted in contravention of any state law when they released certain information to the *Chieftain*. Any alleged leak of sensitive information to the newspaper therefore provides no basis for her equal protection claim.

## 2. *Job Loss*

Separate and apart from her claim based on her loss of the election, Pignanelli also complains of her loss of employment with the school district. Given the Supreme Court's recent holding in *Engquist v. Oregon Department of Agriculture*, however, her claim based on a "class-of-one" equal protection theory

---

[2] A colloquialism coined by Finley Peter Dunne.

must fail. *See Engquist v. Oregon Dept. of Agric.*, __ U.S. __, 128 S. Ct. 2146 (2008). First, just like the plaintiff in *Engquist*, Pignanelli sought to bring an equal protection claim against a public employer based on allegations the employer treated her differently than others similarly situated. As the Court made clear in *Engquist*, this is not a legally cognizable cause of action. Second, Pignanelli has failed to rebut the Defendants' evidentiary showing that she was not qualified for the new position.

In *Engquist*, an Oregon state employee brought an equal protection claim against the state after she was laid off, alleging she lost her job because of "arbitrary, vindictive, and malicious reasons" directed only at her. 128 S. Ct. at 2149. The plaintiff did not get along with one of her co-workers and repeatedly complained about the co-worker to her supervisor. *Id.* Based on instructions given by the district court, a jury found the plaintiff had been intentionally treated "differently than others similarly situated with respect to the denial of her promotion, termination of her employment, or denial of bumping rights without any rational basis . . . ." *Id.* Although the jury rejected the plaintiff's equal protection claims based on race, sex, and national origin, the jury awarded damages on her class-of-one claim.

The court of appeals reversed in relevant part, holding the class-of-one theory of equal protection did not apply in the public employment arena. The court reasoned that allowing such suits to proceed would "completely invalidate

-13-

the practice of public at-will employment." *Engquist v. Oregon Dept. of Agric.*, 478 F.3d 985, 995 (9th Cir. 2007) (quoted in *Engquist*, 128 S. Ct. at 2150). The Supreme Court affirmed the decision of the court of appeals. It too rejected the plaintiff's claim, unequivocally holding that the class-of-one equal protection theory, whatever its contours, "does not apply in the public employment context." *Engquist*, 128 S. Ct. at 2151. A public employee-turned-plaintiff must be a member of an identifiable class to bring an equal protection claim. *Id.*

The Supreme Court has long recognized "a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as lawmaker,' and the government acting 'as proprietor, to manage [its] internal operation.'" *Id.* at 2151 (quoting *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 896 (1961)). The Court has repeatedly sought to reaffirm the common-sense notion "government offices could not function if every employment decision became a constitutional matter." *Id.* (quotation omitted). Therefore, the Court has held "the government as employer . . . has far broader powers than does the government as sovereign." *Id.* (quotation omitted); *see also Connick v. Myers*, 461 U.S. 138, 147 (1983) ("[A]bsent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.").

-14-

The Equal Protection Clause is concerned with governmental classifications that "affect some groups of citizens differently than others," especially those in "an identifiable group." *Engquist*, 128 S. Ct. at 2152 (quotations omitted). "To treat employees differently is not to classify them in a way that raises equal protection concerns. Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship." *Id.* at 2155.

Following the clear commands of *Engquist*, it is obvious the equal protection theory Pignanelli relies on to challenge the non-renewal of her employment contract must fail. The board's decision to allow her contract to lapse rather than rehire her into a position for which she was unqualified does not raise constitutional concerns. Even if the "unequal treatment was not rationally related to a legitimate government purpose," the board's decision—acting in its role as proprietor and employer—does not constitute a violation of equal protection. *See id.* at 2157. In fact, the Supreme Court has "never found the Equal Protection Clause implicated in the specific circumstance where, as here, government employers are alleged to have made an individualized, subjective personnel decision in a seemingly arbitrary or irrational manner." *Id.* at 2155; *see also id.* at 2156 (noting "recognition of a class-of-one theory of equal protection in the public employment context . . . is simply contrary to the concept of at-will employment"). In accordance with the Supreme Court's precedent, we must reject Pignanelli's theory of unequal treatment.

It is true, as Pignanelli points out, one of our previous decisions has already analyzed the class-of-one equal protection theory in the public employment context. *See Bartell v. Aurora Pub. Schs.*, 263 F.3d 1143, 1148–49 (10th Cir. 2001).[3] In *Bartell*, a public school teacher facing accusations of sexual harassment sued the school district after being placed on administrative leave. 263 F.3d at 1145–46. The teacher brought an equal protection claim alleging he was the victim of "selective, purposeful discrimination by government officials who harbor animosity towards [him]." *Id.* at 1148. We framed the legal issue as "not whether [plaintiff's] equal protection theory is well established, but simply whether it is a viable legal theory." *Id.* We concluded the plaintiff's class-of-one equal protection theory based on governmental animosity was viable. *Id.* at 1148–49.

To the extent *Bartell* conflicts with *Engquist*, it no longer represents the law. In *Engquist*, the Supreme Court resolved a circuit split involving the scope of the class-of-one theory—and *Bartell* was on the losing side. *See Engquist*, 478

---

[3] Tenth Circuit cases have dealt with the class-of-one equal protection theory in other contexts, as well. *See, e.g.*, *Bruner v. Baker*, 506 F.3d 1021, 1029 (10th Cir. 2007) (tax commission investigations); *Mimics, Inc. v. Vill. of Angel Fire*, 394 F.3d 836, 848 (10th Cir. 2005) (building inspections); *Jennings v. City of Stillwater*, 383 F.3d 1199, 1210 (10th Cir. 2004) (law enforcement). Given the nature of these class-of-one claims, we must always proceed with great caution. *See Jicarilla Apache Nation v. Rio Arriba County*, 440 F.3d 1202, 1209 (10th Cir. 2006) (noting this and other circuits "have proceeded cautiously in applying the [class-of-one] theory, sensitive to Justice Breyer's warning against turning even quotidian exercises of government discretion into constitutional causes").

F.3d at 993 (9th Cir.) (recognizing split and disagreeing with *Bartell* and other circuit cases applying the class-of-one theory to public employment). "Public employees typically have a variety of protections from just the sort of personnel actions about which [Pignanelli] complains, but the Equal Protection Clause is not one of them." *Engquist*, 128 S. Ct. at 2157.[4] To the extent *Bartell* recognized a public employee's class-of-one equal protection theory, *Bartell* conflicts with *Engquist* and we overrule it.[5]

In laying down this rule, we join several other circuits that have already recognized the implications of *Engquist*. *See, e.g.*, *Appel v. Spiridon*, 531 F.3d 138, 139 (2d Cir. 2008) ("The Supreme Court recently held that the Equal Protection Clause does not apply to a public employee asserting a violation of the Clause based on a 'class of one' theory of liability."); *Wilson v. Libby*, __ F.3d __, No. 07-5257, 2008 WL 3287701, at *20 (D.C. Cir. 2008) ("Under *Engquist* . . . the class-of-one theory of equal protection does not apply in the public employment context." (citation omitted)); *see also Skrutski v. Marut*, Nos. 07-2828 & 07-2848, 2008 WL 2787434, at *6 (3d Cir. July 18, 2008) (slip copy).

---

[4] For example, based on the facts she alleges, Pignanelli may have made out a traditional claim of First Amendment employment retaliation. *See, e.g.*, *Deschenie v. Bd. of Ed. of Cent. Consol. Sch. Dist. No. 22*, 473 F.3d 1271, 1276 (10th Cir. 2007) (analyzing four-factor test laid out in *Dill*).

[5] The text of this opinion has been circulated to all of the active judges of the court and there is no objection.

Finally, even assuming she could have pleaded a valid cause of action, Pignanelli has failed to develop disputed material facts sufficient to survive summary judgment. During the 2002–2003 and 2003–2004 school years, Pignanelli was employed as a part-time drama teacher in one of the district's middle schools. Responding to changes in federal law, however, the part-time position was eliminated and a new full-time position, covering a wider range of subjects, was created. The Defendants presented evidence in the district court, which Pignanelli failed to rebut, showing Pignanelli was not qualified for the new position. Therefore, quite apart from her school board candidacy playing a role in her not receiving the new job, she did not get the job because she was not qualified for it. Given these undisputed facts, Pignanelli has failed to tie the loss of her job to an equal protection violation.

\* \* \*

In sum, the equal protection claims Pignanelli brought against the Defendants based upon her election loss and her job loss cannot withstand summary judgment.

### III. Conclusion

For the reasons set forth above, we AFFIRM.[6]

---

[6] Defendants also argued they were entitled to summary judgment based on qualified immunity. Because we conclude Defendants did not violate the Constitution, we need not resolve this question. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the
(continued...)

---

6(...continued)
allegations established, there is no necessity for further inquiries concerning qualified immunity.").