FILED
United States Court of Appeals
Tenth Circuit

**March 17, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SUNDAY A. ZOKARI,

      Plaintiff - Appellant,

v.

ROBERT M. GATES, Secretary of the
Department of Defense,

      Defendant - Appellee.

No. 07-6173

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 04-CV-940-M)**

---

Submitted on the briefs[*]:

Aletia Haynes Timmons, Timmons & Associates, LLC, Oklahoma City,
Oklahoma, for Plaintiff - Appellant.

John C. Richter, United States Attorney, and Tom Majors, Assistant United States
Attorney, Western District of Oklahoma, Oklahoma City, Oklahoma, for
Defendant - Appellee.

---

Before **LUCERO**, **EBEL**, and **HARTZ**, Circuit Judges.

---

[*]After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument.

**HARTZ**, Circuit Judge.

Plaintiff Sunday A. Zokari is an African-American man born in Nigeria but a naturalized citizen of the United States. He was hired by the Defense Contract Audit Agency (DCAA) in May 2000 as an auditor-trainee in Oklahoma City. He was terminated on February 26, 2001, during his one-year probationary period.

Mr. Zokari brought suit in the United States District Court for the Western District of Oklahoma under Title VII of the Civil Rights Act of 1964, alleging (1) discrimination based on his race and national origin and (2) retaliation for refusing to take an English class suggested by his supervisors, who had expressed concern about his accent. The district court granted summary judgment for DCAA on the retaliation claim, but allowed the discrimination claims to proceed to trial. A jury entered a verdict for DCAA on the discrimination claims. Mr. Zokari contends that (1) he presented sufficient evidence to overcome summary judgment on his retaliation claim; (2) the district court erred in granting DCAA's motion in limine to exclude from trial all evidence regarding his claim that DCAA failed to pay him for his last day of employment; (3) the court improperly excluded the proffered testimony of another African-American employee at DCAA; and (4) the court improperly rejected his requested jury instruction authorizing an inference of discrimination based on his supervisors'

comments about his accent. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## I.   BACKGROUND

There were, of course, disputes below regarding the historical facts. But the only issues to which the disputes relate are the propriety of summary judgment and the rejected instruction. We therefore summarize the evidence in the light most favorable to the appellant, Mr. Zokari, as required in reviewing those two issues. *See Pignanelli v. Pueblo Sch. Dist. No. 60*, 540 F.3d 1213, 1216 (10th Cir. 2008) (on appeal from summary judgment, evidence is viewed in light most favorable to appellant); *Drabik v. Stanley-Bostitch, Inc.*, 997 F.2d 496, 506 (8th Cir. 1993) (on appeal from denial of requested instruction, "evidence must be examined in the light most favorable to the party proposing the instruction").

DCAA, an agency within the Department of Defense, provides auditing, accounting, and financial-advisory services to the Department. DCAA's Oklahoma City office is a suboffice of the branch office in Richardson, Texas. During Mr. Zokari's employment, Paul Peters was the branch manager of the Richardson office.

On May 8, 2000, Mr. Zokari was hired as an auditor-trainee in the Oklahoma City suboffice, subject to a one-year probationary period. He was initially supervised in the Oklahoma City suboffice by Darrell Patterson, but John Michael Green became his supervisor in July. Green also supervised two other

auditor-trainees, Terry Davis and Francine Montgomery, while Patterson supervised one other auditor-trainee, Rebbecca Kerr. Both Patterson and Green were, in turn, supervised by Peters from the Richardson office. Davis, hired in January 2000, only a few months before Mr. Zokari, was the first African-American to work in the Oklahoma City suboffice, and Mr. Zokari was the first Nigerian to work there.

Shortly after Green became his supervisor, Mr. Zokari met with Peters, who expressed concern about his accent and suggested that he take an English class. DCAA's policy was to encourage managers to offer an English class to employees for whom English was a second language. Mr. Zokari rejected the offer, saying that the failure of others to understand his accent resulted from their lack of exposure to people with accents, and that they would get used to it.

In September 2000 Peters and Green met with Mr. Zokari to inquire whether he had taken the English class. Mr. Zokari informed them that he had not. According to Mr. Zokari, their attitudes toward him then markedly changed: Both became hostile, and Green began to give Mr. Zokari vague instructions at work and refused to clarify them. In November 2000 Peters and Mr. Zokari met with a contractor outside the office. The contractor, who had lived in Nigeria for some time, conversed with Mr. Zokari about his homeland. Afterwards, Peters chastised Mr. Zokari for socializing with the contractor. In January 2001 Mr. Zokari requested to be sent to a training seminar, but Green elected to send

-4-

Kerr, a white, native-born woman, instead. When Mr. Zokari persisted, Green signed the papers so that he could attend, but threw the papers at him.

Mr. Zokari also complains that he received minimal guidance from the auditors supervising his work. His supervisors recorded his errors on internal forms (called A-3s), which were then used as evidence of his poor work performance to justify his termination, whereas the errors of the other three auditor-trainees in the Oklahoma City suboffice were not recorded or used against them. Instead, the other auditor-trainees were given constructive feedback and the opportunity to correct their errors. Moreover, Mr. Zokari's assigned mentor provided only three hours of mentorship, whereas the other auditor-trainees typically received 24 hours.

In late January 2001 Mr. Zokari attended a final meeting with Green and Peters. They discussed his poor work performance and the difficulty others had in understanding him because of his accent. A month later, on February 26, 2001, Mr. Zokari was terminated. He received a termination letter signed by Peters that listed the reasons for his termination: frequent failure to follow up on or correct errors noted by his supervisors; too many repetitive errors in reports and working papers; failure to follow instructions of supervisors; and excessive use of the telephone for personal calls and use of a government computer for nongovernment work during normal work hours. Mr. Zokari was not paid for his final day of employment until June 2001.

On August 2, 2004, Mr. Zokari, acting pro se, brought suit against DCAA under Title VII of the Civil Rights Act of 1964. His complaint alleged that DCAA discriminated against him on the basis of race and national origin and retaliated "after he opposed illegal activities." Aplt. App. Vol. III at 80. Among the "Background Facts" recited in the complaint is the allegation that DCAA had failed to pay him for his last day of employment, in "violation of Department of Labor guidelines." *Id.* at 80–81. After obtaining counsel, Mr. Zokari filed an amended complaint that largely repeated verbatim the original complaint.

DCAA filed a motion for summary judgment. The district court granted summary judgment on the retaliation claim, but denied summary judgment on the discrimination claims. Before trial DCAA filed a motion in limine to exclude all evidence regarding Mr. Zokari's claim that DCAA had failed to pay him for his last day of employment. It asserted that the money had been paid and that Mr. Zokari was raising for the first time (in a proposed pretrial order and a proposed instruction) a "'labor'" claim based on the late payment of wages. *Id.* at 75. The district court granted the motion, agreeing that Mr. Zokari had raised the "'labor claim'" for the first time in "pretrial filings." *Id.* at 101.

At trial Mr. Zokari offered the testimony of Emmett Holland, an African-American senior auditor in the Richardson office, regarding his experiences as an African-American at DCAA and information he had learned from reviewing employee evaluations in preparation for bringing his own claim of discrimination

against DCAA (which he ultimately decided not to pursue). The district court excluded Holland's testimony on the ground that he lacked personal knowledge of relevant discrimination.

Before closing arguments Mr. Zokari requested an instruction permitting the jury to infer discrimination from comments made by Green and Peters about his accent. The district court denied the request, and the jury rendered a verdict for DCAA on Mr. Zokari's discrimination claims.

Mr. Zokari challenges the verdict, contending that the district court erred in granting DCAA's motion in limine regarding his wage claim, in excluding Holland's testimony, and in failing to give his proposed jury instruction. He also appeals the court's award of summary judgment to DCAA on his retaliation claim. We first address the retaliation claim.

## II. RETALIATION CLAIM

The district court granted DCAA's motion for summary judgment on Mr. Zokari's retaliation claim. We review the district court's ruling de novo. *See Pignanelli*, 540 F.3d at 1216. Summary judgment should be granted if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Mr. Zokari contends that his supervisors at DCAA retaliated against him in violation of 42 U.S.C. § 2000e-3(a) by treating him with hostility, disciplining him for poor performance, and eventually terminating his employment because he

refused to take an English class offered to him. Section 2000e-3(a) states in pertinent part: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . ."

In the absence of direct evidence, we review the grant of summary judgment on such a claim under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Medina v. Income Support Div., N.M.*, 413 F.3d 1131, 1135 (10th Cir. 2005). Under this framework Mr. Zokari bears the initial burden of establishing a prima facie case of retaliation, which has three elements: (1) the plaintiff's "protected opposition" under § 2000e-3(a), (2) an adverse employment action against the plaintiff, and (3) a causal connection between the "protected opposition" and the adverse employment action. *Id.* at 1135–36. Opposition is protected under § 2000e-3(a) only if it is opposition to a "practice made an unlawful employment practice by Title VII." *Petersen v. Utah Dept. of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) (brackets and internal quotation marks omitted).

We may assume, without deciding, that Mr. Zokari established the first two elements of his prima-facie case. But his claim of retaliation fails because he cannot establish a causal connection between his protected opposition and the adverse employment action. To establish a causal connection, Mr. Zokari must show that the individuals who took adverse action against him knew of his

protected opposition.  *See Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993).

As we have explained, "[a]n employer's action against an employee cannot be

*because* of that employee's protected opposition unless the employer knows the

employee has engaged in protected opposition."  *Petersen*, 301 F.3d at 1188.  The

employer must know not only that the employee has opposed an action of the

employer (here, the request to take an English class), but that the opposition was

based on a belief that the employer's action constituted discrimination prohibited

by Title VII (here, racial or national-origin discrimination).  *See id.*  As we have

explained:

> [T]his result is compelled not only by the natural reading of the
> statutory language, but also by the purpose of the provision.  The
> purpose of § 2000e-3(a) is to let employees feel free to express
> condemnation of discrimination that violates Title VII.  That purpose
> is hardly served by imposing sanctions upon employers who take
> action against employees who never communicate their concern
> about unlawful discrimination.

*Id.* at 1189.

Although Mr. Zokari may have refused the English class because he felt

that the request was discriminatory, he has not presented evidence that he made

this basis of his refusal known to his supervisors.  He never told them of his

belief that their request constituted improper discrimination based on his race or

national origin.  The only reason he gave Green and Peters for his refusal was that

the failure of others to understand him was due to their lack of exposure to people

with an accent, a problem that would disappear over time.  This explanation

-9-

would not have informed his supervisors that he was opposing a violation of Title VII. The natural interpretation of his remarks is that he was refusing the request because he thought the course unnecessary.

Accordingly, we affirm the district court's grant of summary judgment for DCAA on Mr. Zokari's retaliation claim.

## III. WAGE CLAIM

Less than two weeks before the scheduled date for trial, DCAA filed a "Motion in Limine as [to] 'Labor Claims'," Aplt. App. Vol. III at 75, in response to a proposed pretrial order and a proposed instruction filed by Mr. Zokari. DCAA's motion sought to exclude from trial any evidence "regarding the failure to pay [Mr. Zokari] for his last day of employment." *Id.* The motion was premised on the grounds that (1) Mr. Zokari had originally alleged that failure to pay his last day's wages was an act of retaliation, (2) the money had been paid, (3) the court had granted summary judgment against Mr. Zokari on the retaliation claim, and (4) Mr. Zokari had just raised for the first time (in the proposed pretrial order and proposed instruction) a "'labor'" claim based on the late payment. *Id.* at 75. The district court granted the motion, agreeing with DCAA that Mr. Zokari had not raised a wage-law claim until the eve of trial.

On appeal Mr. Zokari complains that the district court's ruling in essence granted summary judgment against him on his wage-law claim (although his brief on appeal never cites a federal or state law under which he was bringing such a

claim).  The heart of his argument is that, contrary to what the district court said,

he had consistently raised a wage-law claim in his original complaint and

thereafter.  We agree with Mr. Zokari that the court's grant of the motion in

limine was not an evidentiary ruling but was a substantive ruling that he could not

pursue a particular cause of action (a wage-law claim) at trial.  Nevertheless, we

affirm the district court.  We begin our analysis by describing the relevant

pleadings below.

Mr. Zokari's original pro se complaint, filed on August 2, 2004, clearly

describes itself as arising under Title VII.  The caption of the complaint contains

the following description of the cause of action: "Discrimination in Violation of

Title VII (RACE and NATIONAL ORIGIN)."  *Id.* at 79.  The portion of the

complaint headed "Parties and Jurisdiction" recites the parties and then states:

> 4.      Plaintiff is an African-American employee bringing this action
> in response to his being discriminated against by the Agency on the
> basis of his race (African-American) and his national origin (Africa)
> both in violation of Title VII of the Human Rights act.

> 5.      This action is brought for violation of Title VII of the Civil
> Rights Act of 1964, discrimination on the basis of race and/or
> retaliation after he opposed illegal activities.

*Id.* at 79–80.  The remainder of that portion of the complaint recites the basis of

venue and jurisdiction (citing to the general provisions of Title 28 and special

provisions in Title 42 for discrimination claims) and alleges compliance with the

notice and administrative-exhaustion requirements of Title VII.  No wage law is

cited.  The heading for the final 12 paragraphs of the complaint (up to the prayer for relief) is "Background Facts." *Id.* at 80.  The paragraphs in that section recite complaints about his accent, the lack of training provided to him, examples of racial harassment, and adverse actions taken against him.  One such adverse action is alleged in ¶ 20, which states in full:  "Plaintiff was not paid through the last day of his employment, which constitutes a violation of Department of Labor guidelines."  *Id.* at 81.

Mr. Zokari later retained counsel, who filed an amended complaint in July 2005.  The amended complaint is virtually identical in all material respects to the original pro se complaint.  The above description of the pro se complaint describes the amended complaint verbatim except that the caption contains no description of the cause of action.

On November 20, 2006, DCAA filed its motion to dispose of the entire case through summary judgment.  Reading the complaint as a whole as raising only Title VII claims, the motion makes no mention of any wage-law claim.  The motion makes only two references to ¶ 20 of the amended complaint.  Paragraph 15 of the statement of uncontroverted facts asserts that Mr. Zokari was paid through his final day of employment.  And in the motion's "Statement of the Case," after reciting that Mr. Zokari had alleged discrimination by (1) being provided less training than white employees, (2) being directed to take an English

-12-

class, and (3) having his work reviewed more than other employees, it appends a footnote saying:

> Plaintiff further alleges that he was not paid for his time on the last day of his employment. Whether or not this is an act of discrimination, plaintiff has conceded that he has now been paid the approximately $100.00 he alleged he earned his last date of employment. This issue is moot.

Aplt. App. Vol. I at 18 n.5. More importantly, the response to the motion for summary judgment, filed by Mr. Zokari's attorney on January 25, 2007, makes no mention of a claim under any wage law. Its only reference to wages earned on Mr. Zokari's final day of employment is in the section entitled "Plaintiffs [sic] Response to the Defendants [sic] Statement of Uncontroverted Facts." *Id.* Vol. II at 10. In response to DCAA's ¶ 15, he asserts that payment for his last day's wages was several months late.

On March 16, 2007, the district court granted DCAA's motion as to the retaliation claim, set the discrimination claims for trial, and, not surprisingly, said nothing about any possible wage claim. Trial was scheduled for April 9.

The pleadings that precipitated DCAA's motion in limine were filed shortly after the district court's summary-judgment ruling. On March 27, eleven days after that ruling, and less than two weeks before the scheduled trial date, Mr. Zokari submitted a proposed jury instruction entitled "CLAIM FOR UNPAID WAGES." *Id.* Vol. III at 73. Referencing Oklahoma statute, title 40, § 165.3, the instruction told the jury that payment for an employee's final wages must be paid

by the next regular payday and that late payment is subject to a penalty up to the amount of the unpaid wages. Two days later, in a proposed final pretrial report, Mr. Zokari recited as a legal issue for trial: "Did the Defendant violate the Fair Labor Standards Act relative to work performed by the Plaintiff pursuant to 29 U.S.C.A. 216 and 40 O.S. 165.3?" *Zokari v. Gates*, No. CIV-04-0940-M (W.D. Okla.) (Final Pretrial Report, March 29, 2007, at 3). The report also contained DCAA's objection to this issue on several grounds, including that it had not been pleaded. That same day, DCAA filed its motion in limine to exclude evidence regarding Mr. Zokari's claim that DCAA had failed to pay his final wages on time. The district court granted the motion, saying that Mr. Zokari's "'labor claim' was raised for the first time in his pretrial filings and . . . [DCAA] was never on notice that [he] was asserting such a claim." Aplee. Supp. App. at 80.

Mr. Zokari contends on appeal that he had raised his wage-law claim well before the district court's summary-judgment ruling. In particular, he points to ¶ 20 of his amended complaint, which alleged: "Plaintiff was not paid through the last day of his employment, which constitutes a violation of Department of Labor guidelines." Aplt. App. Vol. III at 87.[1]

---

[1]On appeal Mr. Zokari argues that he had also raised his wage-law claim on two other occasions. First, he asserts that in his deposition he "reiterated that he was pursuing the claim for unpaid wages." Aplt. Br. at 15. But as we read his testimony, he was treating the nonpayment as an act of discrimination and made

(continued...)

In our view, the district court properly ruled that Mr. Zokari had not timely raised a wage-law claim. We recognize that most of our sister circuits have stated the general rule that a complaint need not set forth the plaintiff's legal theories. *See* 2 James Wm. Moore et al., Moore's Federal Practice § 8.04[3] n.13 (3d ed. 2008) (collecting cases); 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1215 n.1 (3d ed. 2004) (same). And one might say that ¶ 20 of Mr. Zokari's amended complaint adequately states the basis of a wage-law claim. But the complaint must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,'" *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). And Federal Rule of Civil Procedure 8(e) states that "[p]leadings must be construed so as to do justice." We would not be doing justice if, in the present context, we were to construe Mr. Zokari's amended complaint as providing notice to DCAA of a wage-law claim.

---

[1](...continued)
no reference to a possible wage-law claim. Second, he contends that his wage-law claim was raised in the Joint Status Report and Discovery Plan filed on May 26, 2006. But he did not rely on this pleading in his objection to the motion in limine or in his motion to reconsider the district court's ruling granting the motion in limine. Nine days after the court denied the motion to reconsider, he filed "Plaintiffs' Formal Offer of Proof Regarding the 'Labor Claim' and Brief in Support," which referenced the status report for the first time and attached a copy. This was too late to raise the issue, particularly when the offer of proof requested no action by the district court. We will not reverse on a ground not properly presented below. *See Shoels v. Klebold*, 375 F.3d 1054, 1061 (10th Cir. 2004).

Aside from ¶ 20, every signal in the amended complaint informed DCAA that Mr. Zokari was *not* raising a wage claim under the Fair Labor Standards Act (FLSA) or some state law. The failure to cite a wage-law statute is only part of the story. The amended complaint affirmatively states that Mr. Zokari "is an African-American employee bringing this action in response to his being discriminated against by the Agency on the basis of his race (African-American) and his national origin (Africa) both in violation of Title VII of the Human Rights Act" and that "[t]his action is brought for violation of Title VII of the Civil Rights Act of 1964, discrimination on the basis of race and/or retaliation after he opposed illegal activities." Aplt. App. Vol. III at 85–86. The allegation that Mr. Zokari had not been paid all his wages is one of 12 paragraphs under the heading "Background Facts." It appears within a series of paragraphs alleging acts showing that he had been subject to discrimination or retaliation. Paragraph 20 is preceded by a paragraph alleging that "[i]t would appear that no African-American employees worked in this department during any of the past thirty (30) years," *id.* at 87, and is followed by a paragraph describing statements made at his EEOC hearing. One would naturally conclude that the purpose of alleging that nonpayment of his wages was contrary to "Department of Labor guidelines," *id.* at 87, was to reinforce that there was no legitimate reason for nonpayment, thereby implying that the reason must have been discrimination or

retaliation. A pleading should be read as a whole. And reading Mr. Zokari's amended complaint as a whole, it plainly asserts only claims under Title VII.

In short, it would be a stretch to construe Mr. Zokari's amended complaint as putting DCAA on notice of a wage-law claim. To be sure, courts often, and properly, engage in such a stretch. But whether or not to do so should depend on the status of the litigation. A decision that "do[ing] justice," Fed. R. Civ. P. 8(e), requires an expansive construction of a complaint will turn on the fairness to the parties and the burdens on the court that would result from giving a pleading a possible, but improbable, reading. Early in litigation, justice is usually served by expansively construing complaints. For example, if DCAA had initially responded to the complaint by moving to dismiss because Mr. Zokari had not properly exhausted administrative remedies, and if Mr. Zokari had replied that this ground for dismissal did not apply to his wage-law claim, then the district court would have been well-advised to construe the complaint as raising such a wage-law claim. After all, the court would likely grant leave to amend the complaint to allege a wage claim unambiguously. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.") Little purpose would be served by requiring a motion to amend.

In other circumstances, however, reading a complaint so expansively could create injustice. This may be the thinking behind the statement by the Seventh Circuit that "identif[ying] the wrong statute as the basis for [the plaintiffs']

-17-

claim" was not important "as long as [their] allegations gave notice of a legally sufficient claim . . . and they brought the legal support for their claim to the district court's attention in their response to the defendants' summary judgment motion." *Ryan v. Ill. Dep't of Children & Family Servs.*, 185 F.3d 751, 764 (7th Cir. 1999). A court, we can infer, should not stretch to read a complaint as asserting a claim not pursued by the plaintiff in response to a summary-judgment motion.

The Second Circuit's opinion in *Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2d Cir. 1988), is a particularly informative illustration of how the litigation context can inform how broadly a court should construe a complaint. The Second Circuit has consistently stated that complaints need not state legal theories. *See, e.g.*, *Newman v. Silver*, 713 F.2d 14, 15 n.1 (2d Cir. 1983). In *Brock*, however, the court held that a complaint by the Secretary of Labor alleging failure to pay overtime stated a claim under § 17 of the Fair Labor Standards Act, 29 U.S.C. § 217, but not under § 16, 29 U.S.C. § 216, and therefore the district court had lacked authority to grant relief under § 16. *See* 840 F.2d at 1062–64. Section 17 authorizes suits by the Secretary for injunctive relief plus an order requiring the employer to pay unpaid wages. *See id.* at 1063. Section 16(c) permits further relief—namely, recovery of liquidated damages in addition to back wages. *See id.* The complaint in *Brock* referred only to § 17, never to § 16; but the prayer for relief included liquidated damages, which were available only under § 16(c), and

the district court had granted that relief. Under general principles one would think this an easy case and construe the complaint to raise a claim under § 16(c) as well as § 17. But an unusual feature of the case was that a defendant has no right to a jury trial for a claim under § 17 (which provides for only equitable relief), whereas there is a right to a jury in a suit for liquidated damages under § 16(c). *See id.* The Secretary argued that the defendant should have noted the prayer for liquidated damages and demanded a jury trial if it did not wish the district judge to rule on liquidated damages under § 16(c). The Second Circuit, however, held that the defendant could properly read the complaint as seeking only § 17 relief, and the Secretary should have sought to amend the complaint if he wanted liquidated damages. *Id.* at 1064. *See Reich v. Tiller Helicopter Servs., Inc.*, 8 F.3d 1018, 1032–35 (5th Cir. 1993) (following *Brock*). *But see Martin v. Deiriggi*, 985 F.2d 129, 134–35 (4th Cir. 1992) (distinguishing *Brock*).

The result in *Brock* can best be understood as an application of Fed. R. Civ. P. 8(e) ("[p]leadings must be construed so as to do justice") to preserve the right to a jury trial. A party has only a limited time to demand a jury. *See* Fed. R. Civ. P. 38(b). A plaintiff should not be permitted to deprive a defendant of a jury trial by burying a legal claim (for which there is a right to a jury) in a complaint seeking equitable relief (for which there is no right to a jury) and then, when it is too late for the defendant to demand a jury, surfacing the legal claim. The plaintiff should be required, as *Brock* held, to amend the complaint to state the

-19-

legal claim, thereby providing the defendant an opportunity to demand a jury on the claim, *see id.*

This approach of applying Fed. R. Civ. P. 8(e) to construe pleadings in light of the stage of the district-court proceedings is implicit in our own case law. In this circuit when a plaintiff attempts to add a new theory—a new cause of action—late in the game, the issue has not been whether the legal theory should be read into the complaint, but whether an amendment to the complaint should be permitted. We have stated:

> Courts will properly deny a motion to amend when it appears that the plaintiff is using Rule 15 to make the complaint "a moving target," *Viernow v. Euripides Dev. Corp.*, 157 F.3d 785, 800 (10th Cir. 1998), to "salvage a lost case by untimely suggestion of new theories of recovery," *Hayes v. Whitman*, 264 F.3d 1017, 1027 (10th Cir. 2001), to present "theories seriatim" in an effort to avoid dismissal, *Pallottino v. City of Rio Rancho*, 31 F.3d 1023, 1027 (10th Cir. 1994), or to "knowingly delay[] raising [an] issue until the 'eve of trial,'" *Walters v. Monarch Life Ins. Co.*, 57 F.3d 899, 903 (10th Cir. 1995).

*Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1206 (10th Cir. 2006) (brackets in original). This statement would make no sense if, regardless of the course of litigation, we always construed complaints to raise any legal theory supported by the allegations of the complaint. If that were our rule, then a motion to amend would not have been necessary—the "'new theories of recovery,'" *id.*, would be read into the unamended complaint.

Of particular interest is *Viernow*, 157 F.3d at 799–800, in which we affirmed the denial of a motion to amend the complaint to add federal claims of violation of the Securities and Exchange Act to a complaint that alleged violations of the Texas Securities Act. And in *Pallottino*, 31 F.3d at 1025–27, we affirmed the denial of a motion to amend to add a claim under the Fourth Amendment to a complaint alleging a Fifth Amendment violation based on the same alleged facts. *See Foman v. Davis*, 371 U.S. 178, 181–82 (1962) (remanding for reconsideration of motion to amend to add *quantum meruit* claim to complaint alleging breach of agreement not to make a will, when amendment would present no new facts and do "no more than state an alternative theory for recovery"). Implicit in these decisions is that the original complaint needed to be amended—that is, the new theory of recovery was not raised by the original complaint even though the predicate facts were alleged.

The underlying principle is stated in *Evans v. McDonald's Corp.*, 936 F.2d 1087 (10th Cir. 1991), although without referencing Fed. R. Civ. P. 8(e). In *Evans* the plaintiff, in response to a motion for summary judgment, for the first time characterized her claim as a retaliatory failure to hire rather than, as before, a retaliatory discharge. We upheld the district court's refusal to address the new theory. We wrote:

> As a general rule, a plaintiff should not be prevented from pursuing a
> valid claim just because she did not set forth in the complaint a
> theory on which she could recover, "provided always that a late shift

in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits." 5 C. Wright & A. Miller, Federal Practice & Procedure § 1219 at 194 (1990) [now § 1219 at 282–83 (2004)] . . . .

We do not believe, however, that the liberalized pleading rules permit plaintiffs to wait until the last minute to ascertain and refine the theories on which they intend to build their case. This practice, if permitted, would waste the parties' resources, as well as judicial resources, on discovery aimed at ultimately unavailing legal theories and would unfairly surprise defendants, requiring the court to grant further time for discovery or continuances.

936 F.3d at 1090–91. Expressing that holding in terms of Rule 8(e), one would say that it would not have served justice at that stage of the proceedings to construe the plaintiff's complaint as encompassing a failure-to-hire claim. As a leading treatise states, "It must be remembered that an undue amount of permissiveness toward the pleadings by the judicial system eventually may be reflected as an unwarranted increase in the burden on the other parties and the district judge." Wright & Miller, *supra*, § 1286 at 764–65.

Here, Mr. Zokari did not present his wage-law claim to the district court in response to DCAA's motion for summary judgment. He waited until the eve of trial. In that context the district court properly refused to construe the amended complaint so broadly as to include a wage-law claim. *See Evans*, 936 F.2d at 1091. As our precedents suggest, Mr. Zokari simply acted too late to burden the court and the defendant with a new theory for relief.[2]

_____

[2]Mr. Zokari might have pursued his wage-law claim at trial by obtaining

(continued...)

-22-

We affirm the district court's grant of DCAA's motion in limine.

## IV. EXCLUSION OF HOLLAND'S TESTIMONY

Mr. Zokari also contends that the district court erred by excluding the testimony of Emmett Holland, an African-American senior auditor from the Richardson office of DCAA. We review the district court's decision to exclude his testimony for an abuse of discretion. *See Coletti v. Cudd Pressure Control*, 165 F.3d 767, 776 (10th Cir. 1999).

In the pretrial report Mr. Zokari stated that Holland would "testify that he was rated lower than non-black counterparts, . . . testify about errors made on A-3's [internal auditing forms], [and] testify about his conversations with Defendants Counsel about such and the atmosphere of discrimination in the agency that he relayed while being interviewed by Defense Counsel." *Zokari*, No. CIV-04-0950 (Final Pretrial Report at 15). At trial, counsel for DCAA sought to exclude the evidence on the ground of lack of personal knowledge. He argued:

---

[2](...continued)
court permission to amend his complaint. But he makes no effort to argue that he would have been entitled to such an amendment. In any event, it would have been no abuse of discretion for the district court to refuse to add the additional claim (with an apparent value of no more than $100) at such a late stage of the proceedings. *See id.* ("The grant of leave to amend the pleadings pursuant to Rule 15(a) is within the discretion of the trial court, and we will not reverse the court's decision absent an abuse of discretion." (brackets, citation and internal quotation marks omitted)); *Las Vegas Ice & Cold Storage Co. v. Far West Bank*, 893 F.2d 1182, 1185 (10th Cir. 1990) ("Untimeliness alone may be a sufficient basis for denial of leave to amend.").

According to the statements of the final pretrial report, he would testify that he was rated lower than non-black counterparts. I'm concerned they will not be able to lay a foundation that this witness has access to every evaluation of every employee similarly situated to him—not similarly situated in the context of color—but he would have to be able to have access to that and then if he doesn't have access to that, then he is testifying as an expert and he is not an expert.

He would also testify about errors made on A-3s. He did not work in this office. He did not work with any of these senior auditors that prepared the A-3s that are subject to the lawsuit. I think that that is not relevant, what A-3s that somebody else in the Dallas office prepared.

Finally, in conversations with defense counsel, I think that is irrelevant.

Atmosphere discrimination in the agency, I would like to know the foundation of his knowledge there. Unless he has personal experience throughout the worldwide offices of DCAA, he is not able to testify with his personal knowledge and he has not been designated as an expert.

Aplt. App. Vol. IV(A) at 191–92.

When counsel for Mr. Zokari then spoke, she did little to suggest Mr. Holland's personal knowledge. She began by saying that Holland "got his information from the business records of the Union when he was contemplating filing a grievance against . . . Peters for his low ratings, so he has personal knowledge about which he can testify." *Id.* at 192. In response to questions from the court, she added,

The A-3s are about when he came up as he has gone through and had people working under and around him, that they are prevalent, the

errors are prevalent in those. That has been his experience everytime he has been with [DCAA]. I believe he has been there over 20 years.

*Id.* at 192–93. She also said:

He will testify to his experience at DCAA, his conversations with [DCAA's trial attorney] where he informed him that there is an atmosphere of discrimination at that agency, and the A-3s, the errors that he has seen. He came in and out of the Oklahoma City office, he would come to Oklahoma City and do audits also. That is the only reason why he is going to be able to testify to those things.

*Id.* at 193–94.

The court said that it would decide the admissibility issue after counsel conducted a voir dire of Holland outside the jury's presence. On direct examination by DCAA's counsel at voir dire, Holland testified as follows: He had been employed by DCAA for 20 years and was currently a senior auditor at DCAA and a steward for the local union. As a union steward he had access to DCAA employee evaluations upon request. He had not requested any information for Mr. Zokari's case, but he had examined records in 2003 or 2004 when he had considered bringing his own claim of discrimination against DCAA. In preparation for his case, he had obtained the evaluations for all DCAA employees in the Richardson branch office for the year of his grievance. (He had not reviewed employee evaluations for 2000 or 2001, the years that Mr. Zokari worked at DCAA.) He admitted that he was not familiar with the work performance of the DCAA employees whose evaluations he had reviewed and that he had not looked at the files used to evaluate the employees.

Holland's cross-examination by Mr. Zokari's counsel was brief:

Q:      During your 20 years at the DCAA, have you seen African-Americans and minorities have a difficult time with regard to evaluations and ratings and mentoring and on-the-job training?

        I know that is a lot of questions, do you want me to break it up?

A:      Yes, yes, and yes.

Q:      You answered my question.

A:      Yes.

Q:      Okay.

A:      Because I think it was two or three parts and the answer is yes.

Q:      Has that been while Paul Peters has been the branch manager?

A:      I have been here since 1989, I have been in this agency since 1987.  The answer to that question would be yes.

*Id.* at 204.

Because the district court had announced that it would decide the admissibility of Holland's testimony upon completion of the voir dire, it was incumbent on Mr. Zokari to establish the basis on which Holland would testify. This he failed to do.  It was clear from the voir dire that Holland did not have personal knowledge of discriminatory evaluations by DCAA.  He knew the evaluation scores for employees two or three years after Mr. Zokari's termination, but he could not know if the evaluations were discriminatory because he knew nothing regarding the work performance of any employee except himself.

-26-

Although he may have had knowledge of other discriminatory conduct, his testimony did not provide sufficient information concerning his knowledge of such conduct for the district court to decide that he had personal knowledge of matters relevant to Mr. Zokari's trial. In this circumstance, the district court did not abuse its discretion in ruling that Holland's testimony should be excluded for lack of personal knowledge. *See* Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

## V. JURY INSTRUCTION

Mr. Zokari finally contends that the district court erred by failing to give the jury the following requested instruction:

> In a national origin case comments regarding a plaintiff's accent may constitute indirect evidence of discrimination where there is no showing that language difficulties would interfere with a plaintiff's ability to perform the duties of the job.

Aplt Br. 18. Without this instruction, Mr. Zokari argues, the jury was provided no guidance on how to consider evidence regarding his accent.

We review de novo the instructions as a whole to determine whether they accurately informed the jury of the governing law. *Whittington v. Nordam Group Inc.*, 429 F.3d 986, 996 (10th Cir. 2005). But we review for abuse of discretion a district court's decision to deny a request for a particular jury instruction. *McKenzie v. Benton*, 388 F.3d 1342, 1348 (10th Cir. 2004). "As long as the

-27-

charge as a whole adequately states the law, the refusal to give a particular instruction is not an abuse of discretion." *Id.* (internal quotation marks omitted).

We agree with Mr. Zokari that an employer's comments regarding a plaintiff's accent may constitute circumstantial evidence of discrimination based on national origin. *See Carino v. Univ. of Okla. Bd. of Regents*, 750 F.2d 815, 819 (10th Cir. 1984); 29 C.F.R. § 1606.1 (defining national origin discrimination to include "the denial of equal employment opportunity . . . because an individual has the physical, cultural or linguistic characteristics of a national origin group"). But

> a party is not entitled to a specific jury instruction on every correct proposition of law. When the other instructions establish a sound basis for an argument by the party to the jury on that proposition, an additional instruction is not essential and runs the risk of suggesting that the trial judge has adopted the party's view.

*Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1023 (10th Cir. 2004).

In our view, the jury was provided with sufficient guidance to consider evidence regarding Mr. Zokari's accent. The instructions conveyed the value of circumstantial evidence, even pointing out that "[i]ntentional discrimination, if it exists, is seldom admitted." Aplt. App. Vol. III at 158. The connection between Mr. Zokari's nationality and his accent was clear from the trial testimony, and Mr. Zokari's counsel raised the issue repeatedly in closing argument. The district court acted well within the proper limits of its discretion in determining that the jury did not need the requested instruction to evaluate the evidence fairly.

## VI.  CONCLUSION

We AFFIRM the judgment below.