FILED
United States Court of Appeals
Tenth Circuit

August 14, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

NYDIA DEFREITAS,

               Plaintiff - Appellant,

    v.

HORIZON INVESTMENT
MANAGEMENT CORP.; JAMES
TERRY,

               Defendants - Appellees.

No. 08-4034

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 2:06-CV-00926-DB)**

---

Bruce M. Franson (Robert H. Wilde with him on the briefs), of Robert H. Wilde,
Attorney at Law, P.C., Midvale, Utah, for Plaintiff - Appellant.

Lisa Marcy McGarry (Lincoln W. Hobbs with her on the brief), of Hobbs &
Olson, L.C., Salt Lake City, Utah, for Defendants - Appellees.

---

Before **HARTZ**, **HOLLOWAY**, and **McKAY**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

     James Terry, the president of Horizon Investment and Management

Corporation, fired Nydia DeFreitas while she was on a leave of absence to

recover from a hysterectomy. She sued Horizon and Mr. Terry in the United States District Court for the District of Utah, claiming (1) that the firing interfered with her rights under the Family and Medical Leave Act of 1993 (FMLA), 5 U.S.C. §§ 6381–6387, 29 U.S.C. §§ 2601–2654; (2) that Mr. Terry, a member of The Church of Jesus Christ of Latter-day Saints (LDS),[1] fired her because she is a Catholic, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e through 2000e-17; and (3) that she was subjected to a work environment that was hostile to those who were not LDS, also in violation of Title VII. The district court granted Defendants summary judgment on all three claims, and Ms. DeFreitas appeals with respect to her FMLA and religious-discrimination claims. We have jurisdiction under 28 U.S.C. § 1291. We reverse on Ms. DeFreitas's FMLA claim, but affirm on her religious-discrimination claim.

I.     BACKGROUND

Because we are reviewing a summary judgment, we will evaluate the evidence in the light most favorable to Ms. DeFreitas, but we summarize evidence unfavorable to her claims as well as the favorable evidence. *See Zokari v. Gates*, 561 F.3d 1076, 1079 (10th Cir. 2009).

---

[1]The parties use the terms LDS and Morman interchangeably. For consistency, we will use LDS throughout this opinion, except in quotations.

**A.     The Events Leading Up To Ms. DeFreitas's Termination**

Horizon, a company with about 190 employees, manages residential properties in Nevada and Utah. Its responsibilities range from readying and renting out apartments to hiring and training the employees who staff these properties. Some properties qualify for low-income-housing tax credits if sufficient residents are eligible; eligibility claims must be documented and are subject to government audit.

Mr. Terry was responsible for overseeing hiring, firing, and employee-compensation decisions, although individual vice presidents could also hire and fire. In June 2004, Ms. DeFreitas was hired to work at Horizon by Tammy Godfrey, a vice-president. She began as a manager of the Ridgeview Apartments in North Ogden, Utah.

Her talents were recognized early on. As Mr. Terry observed in his deposition, she was "an outstanding leasing agent and ha[d] always been an excellent leasing agent" with "very good skills related to people." Aplt. App., Vol. A at 309. She was soon transferred to Layton Pointe, a more challenging property that had undergone over one million dollars' worth of rehabilitation. There she did "very well," according to Mr. Terry. *Id.* "You are a dynamite employee," he wrote her in a November 2004 email. "[W]e are so glad to have you as part of our team and even more pleased to have you at Layton [Pointe]. Thanks for all you do and all the extra thought, time and energy." *Id.*, Vol. B at

747. About that time—less than half a year after she had begun with Horizon—Mr. Terry gave her a raise.

Ms. DeFreitas took time off for maternity leave to have a baby in May 2005. She returned to Horizon as a so-called "floating manager" entrusted with assisting in the management of several properties. Again, Mr. Terry testified that she "[d]id very well." *Id.* at 309.

In the summer of 2005, another company offered Ms. DeFreitas a $36,000 salary—$8,000 more than Horizon was paying her—to be a manager. She tendered her resignation to Horizon, but Mr. Terry responded by offering her a raise to $38,000 and a promotion to regional vice president. She opted to stay at Horizon, receiving her raise on September 1, 2005.

By this time, Ms. DeFreitas's management duties included three properties—Park Place Apartments, Edison Place Apartments, and Westgate, all located in or near downtown Salt Lake City. She regarded these properties as the company's most difficult. Mr. Terry described Park Place as particularly challenging, "a beast with lots of tentacles." *Id.*, Vol. B at 731. Park Place's owner, Jonathon Morse (also the owner of Edison Place), was very demanding, and Ms. DeFreitas was Horizon's third manager there. The occupancy rate was below Morse's expectations, and not enough units were rented to low-income residents for it to qualify for tax credits. Ms. DeFreitas worked over 50 hours a week, including nights and weekends.

Despite these challenges, her success persisted.  On November 21, 2005, Mr. Terry emailed her that even though Edison Place showed a loss in October, "I have got to tell you it is the best number that we have ever had on that property. . . .  You are doing super . . .  Dynamite job . . . ."  *Id.* at 732.  "You are doing an excellent job!" one executive-committee member emailed her on November 23, 2005.  *Id.* at 730.  Morse's son, a member of the homeowners' association board at Park Place, emailed on December 1, 2005:  "Nydia, it[']s 10pm at night and you['re] still working it, good job!  Thanks for all you do!"  *Id.* at 745.

Also in November, Ms. DeFreitas informed Mr. Terry that she needed a hysterectomy and would have to take six weeks of leave.  They did not discuss whether the leave would be paid or unpaid.  Later he suggested that she seek donations of paid sick-leave time from other Horizon managers; but he then retracted that suggestion, informing her that other employees were upset by it.  As a result, she was told that she would have to take unpaid leave after exhausting her paid sick-leave time.  Mr. Terry never informed Ms. DeFreitas of her FMLA leave rights, nor did he ask her to provide any medical certification of her condition.  Indeed, although Horizon's Manual of Operations contained a section on sick leave, it did not contain a section on FMLA leave because, according to Mr. Terry, "I didn't know what it was until the situation came up with [Ms. DeFreitas]."  *Id.*, Vol. A at 144.

Ms. DeFreitas's surgery was on February 15, 2006.  Her doctor instructed her to take six weeks of bed rest and not return to work.  She conversed daily with Mr. Terry, updating him on her condition and informing him that she nonetheless intended to return early, possibly as soon as March 13.  During one such conversation, Mr. Terry expressed concern about the six-week time frame, mentioning that his sister had been able to return to work a few days after her hysterectomy.  While she was on leave Mr. Terry occasionally sent her work to do regarding Park Place.

Some of what Ms. DeFreitas learned about Park Place during her leave was troubling.  Nine days after her surgery Mr. Terry told her that everything at Park Place had become "'crazy,'" and that one of her staff members had been terminated.  *Id.* at 246.  (During her leave, four staffers (all members of the same family) were fired, and a fifth quit before she could be fired.)  Four days later, on February 28, Morse informed her that he and Mr. Terry had decided that Park Place "was too difficult for [her] to handle," *id.*, and removed her from Park Place; but he added that she would continue to manage other Horizon properties.  About that time she received a call from two maintenance employees who were among those that were later fired; they told her that Park Place had been audited and was not doing well, and that they had heard rumors in the administrative office that she would be fired.  She asked Mr. Terry what the problems were, but he said that he did not want to bother her with that while she was recuperating.  In

early March she asked Mr. Terry whether she would be fired from Horizon altogether. He said no, but went on to ask her questions such as "why do you work?"; "do you really need the money?"; and "if you stayed at home, would that be okay?" *Id.* at 112 (internal quotation marks omitted). On March 9 she called Mr. Terry to report on her latest checkup with her doctor, and told him that she would not be able to return to work before April 4. He responded by saying, "Oh, you don't worry about it. You just get yourself better. You know, take care of you and the family and, you know, . . . I'll talk to you later." *Id.* at 71–72 (internal quotation marks omitted).

She was fired the next day. Mr. Terry sent her an email informing her of the decision. It read:

From:      James Terry
Sent:      Friday, March 10, 2006 11:44 AM
To:        Nydia de Freitas
Subject:   Ecclesiastes 3

Nydia,

I have agonized over this decision for weeks. It has been difficult because the Nydia I know or thought I knew is not the same Nydia that so many others feel they know on site. What I truly hope is that the Nydia I know, will remain my friend, a strong wife and mother to her family and someone that will continue to grow and reach the personal and family goals that you set for yourself.

We have uncovered so many different issues at both Edison and Park Place, that are expensive mistakes to the owner and our management company, that we need to not just make a change from working at Park Place, but from working at Horizon. You are very talented and I know, when back in the pink of health, will bounce back and secure

-7-

another job without even a glitch. I know this is a personal setback and a financial strain for a few weeks and am sorry, but . . . you still have a pay check coming next Friday that I will move up to your desired date of receipt if you desire.

I do not think that I need to list reasons, my desire is not to add salt to this wound, but would like the opportunity to visit with you one on one in the future and allow me to make some suggestions that could make your next job more comfortable, more enjoyable and allow you to continue to grow in this field. It is so important to have your staff, your fellow regional's [sic] and managers and your employers back you to the hilt and I hope the ideas that I might share would offer help in that direction.

. . . .

*Id.*, Vol. B at 585.

Ms. DeFreitas had not read the email when Mr. Terry called her three days later, on March 13, to wish her a happy birthday. He said: "I'm sorry how things have turned out. I hope everything is going to be okay with us. I hope, you know, that we're going to be okay." *Id.*, Vol. A at 70 (internal quotation marks omitted). Sensing something was wrong, she checked her email after the conversation. Later she called Mr. Terry to ask why she had been fired. His response was: "You know, when you get better, you come in, we'll sit down and we'll talk about it. You know, you're recovering. When you get better, you can come in and we'll talk about it." *Id.* at 72. They later met in person. But he said no more about the reasons for her termination.

Ms. DeFreitas then sought work at another company, which contacted Mr. Terry. The prospective employer recorded Mr. Terry's responses to certain questions on April 3 as follows:

What were the applicant's job title and duties? Regional – best leaser

. . . .

Reason for leaving? illness

Attendance/punctuality? loyal – hard worker

Strong points? Best leaser he has known

Areas for improvement? take better care of herself

How does this person get along with other people? (coworkers, superiors, etc.) great

Would you rehire? [x] Yes [ ] No

. . . .

*Id.* at 176.

Ms. DeFreitas's termination apparently did not comply with Horizon's Manual of Operations, which permits firing without warning (and thus without an opportunity to improve performance) only for egregious behavior. The Manual states:

Termination of an employee is a drastic measure requiring careful consideration. Termination should be a last step, not a first step, when finding an employee who is doing something wrong. Under minor situations caused by laziness, or not being on time, or doing a job inappropriately, there should be a written warning or a

probationary period applied before something as drastic as termination.

The exception to that would be an employee caught drinking, taking drugs, theft, resident mistreatment, sexual advances to any resident or other employee, manipulating records, etc. Under those circumstances, termination is immediate.

*Id.* at 217. Regarding probation the Manual states:

Unless an employee is immediately terminated for criminal acts, gross negligence, or other activities as described previously, then we should give the employee an opportunity to understand our grievance and to correct the problem.

Please have an interview with the employee on a one-to-one basis and simply and carefully describe <u>and document</u> your professional feelings regarding the employee's performance for whatever reason. Make your complaints brief, simple, and understandable. Ask the employee to repeat what you have said (or their interpretation of it) so that they are understanding what you say. Give the employee a seven to fifteen day probationary period.

*Id.* at 218. The Manual section entitled "Policies on Discharging After Probation" emphasizes the need for documenting poor performance and for warnings to the employee:

Whenever an employee is put on probation and the possibility of termination is evident, the supervisor is responsible to report the probation on the Employee Verbal Warning Form provided to their supervisor. This form should include the reasons for the probation, the date and the outline of their discussion during the personal interview, and any other information which the supervisor feels is necessary. A copy of this form goes into the employee's on-site file (again, confidential) and the original copy goes into the permanent payroll employee file at Pavilion.

This documentation is critical and essential in order to properly document a fair and just treatment of the employee. These written

reports regarding employee problems, sub-performance, and probation interviews, cannot be overlooked.

. . . .

ALL PROBATIONARY ACTIONS AND JOB PERFORMANCE EVALUATIONS BY A SUPERVISOR MUST BE WRITTEN UP AND PROPERLY FILED.

*Id.* at 218–19.  Defendants have not provided any documentation showing that Ms. DeFreitas had been warned or disciplined, and Mr. Terry testified at his deposition that he did not recall having given her any written warning and that he had not placed her formally on probation.  The dismissal of Ms. DeFreitas without a prior exit interview also violated the Manual, which provides:

Prior to any termination of any employee, an exit interview must be held.  In the exit interview, you sit down with the employee and review the reasons for discharge and "put them in writing" including any policies that have been broken and all reasons for termination of the employee.

*Id.* at 217.

We also note the evidence that Ms. DeFreitas points to as supporting her claim that her termination was motivated by religious discrimination.  She is a Catholic and most employees of Horizon are LDS, including Mr. Terry and most, if not all, of the company's executive committee.  She testified that the religious atmosphere at Horizon became apparent to her shortly after she was hired, when she attended a company-wide training session.  Several employees, perhaps including one or more who were conducting the training, asked her questions such

-11-

as "Do you go to church? What church do you attend?" *Id.* at 89 (internal quotation marks omitted). These employees also mentioned that they were LDS, and that Mr. Terry was a former bishop in the church. She disclosed that she was Catholic.

That religious atmosphere, she said, continued throughout her employment. As she and Mr. Terry developed a closer relationship, they would discuss religion almost every week. He provided her with religious literature, joked about converting her, and repeatedly stated that "hiring return missionaries would be a good idea," as "they made good salespeople because they sold the Book of Mormon" and "would help improve . . . the persona of the office." *Id.* at 96–97. In a late 2005 conversation, when Ms. DeFreitas showed signs of work-related stress, Mr. Terry suggested that she and her husband attend church to meet friends and to "bring [her] spirit up." *Id.* at 294 (internal quotation marks omitted). She also mentioned a conversation after her September 2005 promotion: She had hired Emily Bitner as a leasing agent at Park Place, but Bitner had become pregnant and did not intend to return to work after having her baby. When Ms. DeFreitas expressed her displeasure about having to hire another leasing agent, Mr. Terry opined that Bitner was "a good Mormon girl, most Mormon girls stay home after they have children," *id.* at 287 (internal quotation marks omitted)—a comment that Ms. DeFreitas took as disparaging, considering that she *did* return to work after her May 2005 maternity leave.

Ms. DeFreitas also observes that the four workers at Park Place who were fired during her hysterectomy leave were all Catholics. And she points out that the subject line on her own termination email was a biblical reference—namely, "Ecclesiastes 3," *id.*, Vol. B at 585, which is apparently a reference to the biblical language "To everything there is a season." Finally, she notes that her replacement as interim manager at Park Place, Marina Palmer, is LDS.

**B.    Litigation**

On March 29, 2006, Ms. DeFreitas initiated an FMLA complaint with the United States Department of Labor. And on the following May 4 she filed an employment-discrimination complaint with the Utah Antidiscrimination and Labor Division, alleging that her termination was on the basis of religion. Ms. DeFreitas then asked the Utah agency to discontinue its administrative process and requested that the Equal Employment Opportunity Commission issue a notice of her right to sue. When the EEOC provided her with the notice, she filed the present suit in state court on October 6, 2006. Defendants removed the case to federal district court.

During the district-court litigation Defendants offered several reasons for firing Ms. DeFreitas. For each we will summarize Defendants' evidence and the contrary evidence.

One stated concern was Ms. DeFreitas's interpersonal skills. Mr. Terry testified that she had ongoing problems managing her staff and getting along with

others. Ms. DeFreitas, he said, had broached the topic herself when he was trying to persuade her not to leave Horizon for a higher-paying job. In explaining what would keep her at Horizon, she said that there needed to be a stop to rumors within the company that she was a "bitch." *Id.*, Vol. A at 141 (internal quotation marks omitted). He told her that he would have meetings to encourage employees to support one another. At that time he did not investigate whether the rumors were true, "[b]ecause I didn't care. I liked [Ms. DeFreitas], and that's what mattered to me." *Id.* He did state, however, that he later discussed with her "on a couple different occasions" his concerns that she had "a little bit of a temper . . . [a]nd would oft times blow up at her [staff]." *Id.* at 426.

Mr. Terry also testified about information concerning Ms. DeFreitas's relations with subordinates that he had received during the last two months of her tenure. On January 4, 2006, Tony Archuleta, a maintenance worker at Park Place, complained that "she would play one employee against another and she had favorite employees," and that "she would blow up about any variety of things" and "was constantly defensive." *Id.* at 327. Archuleta also alleged that Ms. DeFreitas had visited his home and cursed and threatened him and his wife. Under Horizon's Manual of Operations, cursing at employees is punishable by termination.

Mr. Terry received similar complaints about Ms. DeFreitas in a series of interviews of six employees at Park Place beginning on February 16, the day after

Ms. DeFreitas's surgery. Ironically, the interviews began with a meeting he had called after hearing that all the office employees would quit if Tony Archuleta were not fired. One of the complaints was that he was a "pet" of Ms. DeFreitas and "was allowed to get away with murder." *Id.* at 319. They also complained that she had installed a security camera in the office. They had unplugged it because they thought that she was watching them from her home. Mr. Terry acknowledged, however, that she had installed the camera after some cash had disappeared from the office and that he did not disagree with the installation. The other complaints about which Mr. Terry testified related to mistreatment of employees, such as Ms. DeFreitas's cursing at and humiliating them. Mr. Terry testified that he investigated whether Ms. DeFreitas could be reassigned to other properties, only to be told that the two other regional managers in the Salt Lake City area did not want to work with her. He claimed that he had talked to Ms. DeFreitas numerous times to relay the staff concerns.

In response to the allegations about poor interpersonal skills, Ms. DeFreitas pointed out that there were no written warnings or any other official documentation of these allegations. And even though Mr. Terry claimed to have discussed these matters with her, he conceded that no such conversations were reported in his day-planner notes (which corroborated that he had received complaints from Park Place personnel). She admitted using profanity but never *at* somebody else; and she noted that Marina Palmer, who was promoted to regional

-15-

manager after Ms. DeFreitas's termination, had her own history of yelling and cursing at subordinates. Mr. Terry acknowledged that he had talked to Palmer about swearing at staff, but said that she had corrected the problem.

Another reason that Mr. Terry gave for Ms. DeFreitas's termination was a false time slip. He contended that she had taken off time to see doctors and the hospital before her surgery yet had reported working a full eight hours on her time card. He admitted, however, that he had given her permission to go "back and forth [to her doctors] for different reasons prior to her surgery," *id.* at 316, and that Ms. DeFreitas may have had an understanding that "she was being paid for the time off," *id.* He even conceded that he had instructed Horizon to pay Ms. DeFreitas for the time that she had allegedly missed. Furthermore, Mr. Terry did not discuss the matter with Ms. DeFreitas.

Mr. Terry also stated that a ground for Ms. DeFreitas's termination was her underperformance at Park Place. He testified that he spent a lot of time at the property, including attending meetings with her and the owner, and that he had offered to the owner that she be removed as manager. But other than his previously noted concerns about problems with subordinates, Mr. Terry testified to no specific criticisms regarding Ms. DeFretias's work at Park Place, and he even conceded that another property she was managing, Edison Place, which had the same owner, was "performing very well, at least in our opinion." *Id.* at 418. Moreover, Ms. DeFreitas provided a declaration from Morse, the owner,

-16-

suggesting that she was not the problem at Park Place. He said that before she "was brought in, Horizon had already had numerous difficulties in managing Park Place," such as "the high rate of [Horizon's] staff turnover . . . ." *Id.*, Vol. B at 630. He fired Horizon about a month after Ms. DeFreitas's firing, but he had never identified Ms. DeFreitas as his main reason for terminating his contract with Horizon.

Defendants' last ground for terminating Ms. DeFreitas was her handling of tax-credit compliance for her properties. Lyman Adams, Horizon's chief operating officer, testified in his deposition that Horizon employees in the tax-credit-compliance department had expressed concerns with Ms. DeFreitas's honesty in handling compliance documentation, even before her promotion to regional vice president. He said that he had never spoken to her about the matter but had raised these concerns in several executive-committee meetings (for which no minutes were prepared). He also claimed that he had spoken with Mr. Terry about Ms. DeFreitas and tax-compliance issues at least six times, including just before her termination, and he assumed that Mr. Terry had talked with her. In addition, he thought that one of the compliance employees had spoken with Ms. DeFreitas. Mr. Adams, however, had never seen the allegedly deceptive documents and Defendants produced no documentary evidence of any dishonest record-keeping by Ms. DeFreitas or any documentation of warnings to Ms. DeFreitas about dishonest record-keeping. And in his deposition (which

preceded Mr. Adams's) Mr. Terry did not mention tax-compliance issues as a reason for firing Ms. DeFreitas.

The district court granted summary judgment in favor of Defendants on Ms. DeFreitas's claims of (1) interference with her FMLA rights, (2) religious discrimination under Title VII, and (3) hostile work environment, also under Title VII. On appeal she does not challenge the dismissal of her hostile-work-environment claim.

## II. FMLA INTERFERENCE CLAIM

We review the district court's grant of summary judgment de novo. *See Zokari*, 561 F.3d at 1081. Summary judgment should be granted only if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

An employee is "eligible" for leave under the FMLA if she has been employed for at least 12 months by an employer covered under the statute, and has worked at least 1,250 hours for the employer during the previous 12-month period. 29 U.S.C. § 2611(2). Eligible employees are "entitled to a total of 12 workweeks of leave during any 12-month period" for "a serious health condition that makes the employee unable to perform the functions of the position of such employee." *Id.* § 2612(a)(1)(D). A *serious health condition* is "an illness, injury, impairment, or physical or mental condition that involves . . . inpatient care in a hospital . . . or continuing treatment by a health care provider." *Id.* § 2611(11).

-18-

Once the employee returns from leave, she must be reinstated to her previous position or an equivalent one. *See id.* § 2614(a)(1).

There are two theories of recovery under § 2615(a) of the FMLA. One is a retaliation or discrimination theory under § 2615(a)(2), which makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." *See Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170–71 (10th Cir. 2006). The other, which is relied upon by Ms. DeFreitas, is an interference theory under § 2615(a)(1), which makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."

To establish an FMLA interference claim, "the plaintiff must demonstrate: (1) that . . . she was entitled to FMLA leave, (2) that some adverse action by the employer interfered with . . . her right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of [her] FMLA rights." *Metzler*, 464 F.3d at 1180 (brackets and internal quotation marks omitted). "Under this theory, a denial, interference, or restraint of FMLA rights is a violation regardless of the employer's intent." *Id.* An employer can defend the claim, however, by showing that "the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." *Id.* (internal quotation marks omitted); *see* 29 C.F.R. § 825.216(a)(1) (Department of Labor

FMLA regulation stating that when an employee is laid off during FMLA leave, "[a]n employer would have the burden of proving that an employee would have been laid off during the FMLA leave period and, therefore, would not be entitled to restoration"). Defendants do not argue that Ms. DeFreitas failed to satisfy the first two elements required to establish an interference claim. Thus, we address only whether her firing was *related to* her taking leave, and whether she would have been fired anyway, regardless of leave.

The related-to issue is easy to resolve. Whenever termination occurs while the employee is on leave, that timing has significant probative force. *See Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 961 (10th Cir. 2002) ("The timing of Smith's termination[, which occurred during leave,] also indicates a causal relation between her FMLA leave and her dismissal."). The timing here is particularly suggestive. Ms. DeFreitas's termination occurred just one day after she told Mr. Terry that she would need to take a full six weeks off and could not return sooner. Moreover, Mr. Terry later told Ms. DeFreitas's prospective employer that the reason for her departure was "illness." Aplt. App., Vol. A at 176. There is additional evidence that her termination was related to her leave, but this will suffice.

We now turn to Defendants' claim that Ms. DeFreitas would have been fired even if she had not been taking FMLA leave. Defendants offered evidence that (1) she had significant personality conflicts with her staff, (2) she had

misreported her work time, (3) Park Place's performance was not up to snuff, and (4) she had mishandled tax-credit-compliance documentation. But a reasonable jury could reject Defendants' assertion that she was fired for those reasons.

To begin with, there is a good deal of evidence that she was a highly valued employee doing excellent work. She joined Horizon in June 2004. Within six months she secured a raise and a transfer to the more-challenging Layton Pointe property. In a November 2004 email, Mr. Terry said: "[W]e are so glad to have you as part of our team and even more pleased to have you at Layton [Pointe]. Thanks for all you do and all the extra thought, time and energy." *Id.*, Vol. B at 747. After being offered a job by another company, she received a promotion to regional vice president and a raise from $28,000 a year to $38,000 on September 1, 2005. She was then entrusted with Horizon's three most challenging properties. Praise continued until less than three months before she took leave for surgery. For example, a November 23, 2005, email from a Horizon executive-committee member exclaimed, "You are doing an excellent job!" *Id.* at 730. Two days earlier Mr. Terry had written: "You are doing super. . . . Dynamite job. . . ." *Id.* at 732. (Even after her termination, Mr. Terry told a prospective employer that she was the "[b]est leaser he ha[d] known," and that he would rehire her. *Id.*, Vol. A at 176.)

In contrast to the messages to Ms. DeFreitas extolling her performance, there are none to the contrary. This is particularly striking in light of the

emphasis in Horizon's Manual of Operations on documenting poor performance and warnings to employees. In particular, the Manual provides for probation coupled with formal warnings (rather than immediate termination) absent egregious misconduct; requires the supervisor to conduct an interview with an employee on probation to ensure that she understands her performance problems; emphasizes that documentation is critical to demonstrating fair treatment of the employee; and mandates that upon termination, an exit interview be conducted to provide the employee with written reasons for her discharge. None of these steps was followed here.

Furthermore, there are additional specific reasons to question Defendants' evidence regarding the alleged grounds for Ms. DeFreitas's termination. We address them in the reverse order from our discussion of the district-court evidence.

First, the allegation that Ms. DeFreitas altered tax-credit-compliance documents is not supported by any altered documents or even the testimony of anyone who saw such documents. Nor did Mr. Terry see fit to mention the matter in testifying to his reasons for terminating Ms. DeFreitas.

Second, Defendants do not direct us to any contemporaneous evidence that Ms. DeFreitas's performance in managing apartments was of any concern to Horizon executives. (We leave to the side for the moment the allegations raised in the postleave interviews of her subordinates.) Mr. Terry conceded that her

-22-

performance at Edison Place was good, he testified to no particulars regarding what she had failed to do at Park Place, and the owner of Park Place did not assign any specific blame to her for his terminating Horizon.

Third, Mr. Terry acknowledged that Ms. DeFreitas's alleged misreporting of work time could have resulted from a misunderstanding. And it would be remarkable for him to consider the error to be a ground for firing when he instructed that she be paid for the time even after he learned of the allegedly incorrect reporting.

That leaves the strongest evidence supporting Ms. DeFreitas's discharge—the complaints lodged by her subordinates. But some complaints were inconsistent with one another; in particular, Mr. Archuleta asserted how badly he was treated by Ms. DeFreitas, whereas others complained that she let him get away with everything. Also, Mr. Terry knew that at least one complaint was unfounded—namely, the allegation that Ms. DeFreitas had installed a surveillance camera for improper reasons. And other complaints were short on specifics. Most importantly, however, viewing the evidence in the light most favorable to Ms. DeFreitas, it might well strike the jury as passing strange that Mr. Terry would fire Ms. DeFreitas based on comments by subordinates without first asking her for her version of events, given that she had been considered such a stellar employee for at least 18 of her 21 months with Horizon. When asked at his deposition whether he had "ever seen a situation where underlings who are

unhappy with their supervisors will say things about them which may or may not be correct," he answered, "Absolutely." *Id.* at 316.

Finally, we note the elephant in the room. One reason that a reasonable jury could reject Defendants' assertions regarding the grounds for firing her is that there appears to have been another ground for her firing, a very simple, commonsensical one—namely, that she was missing too much work. This is hardly an unheard-of reason for an employer to discharge an employee. Indeed, the FMLA was enacted because employers had found it in their economic self-interest to fire employees who missed too much work for medical care or other reasons now addressed by the FMLA. It would be eminently reasonable to believe that an employer who was ignorant of the FMLA—as Mr. Terry admitted he was before Ms. DeFreitas complained of her firing—would engage in the very practice that the FMLA was enacted to prevent. Recall that Mr. Terry told Ms. DeFreitas's next employer that she had lost her job because of "illness." Accordingly, we conclude that there is a genuine issue of fact concerning whether Horizon would have fired Ms. DeFreitas regardless of whether she took FMLA leave.

## III.   RELIGIOUS-DISCRIMINATION CLAIM

Ms. DeFreitas also challenges the summary judgment in favor of Horizon[2] on her religious-discrimination claim.  We reject the challenge.

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Ms. DeFreitas's claim was that "[a] factor motivating Horizon's termination of Plaintiff and others was their Catholic religious faith affiliation." Aplt. App., Vol. A at 11.

> To establish a prima facie unlawful discharge case, the plaintiff must show the following:
>
> (1) that [s]he was subjected to some adverse employment action;
>
> (2) that, at the time the employment action was taken, the employee's job performance was satisfactory; and
>
> (3) some additional evidence to support the inference that the employment actions were taken because of a discriminatory motive based upon the employee's failure to hold or follow his or her employer's religious beliefs.

---

[2] Ms. DeFreitas does not have a claim against Mr. Terry under Title VII. *See Haynes v. Williams*, 88 F.3d 898, 901 (10th Cir. 1996) ("[W]e agree with the majority view that, taken as a whole, the language and structure of amended Title VII continue to reflect the legislative judgment that statutory liability is appropriately borne by employers, not individual supervisors.").

*Fischer v. Forestwood Co.*, 525 F.3d 972, 978–79 (10th Cir. 2008) (emphasis and internal quotation marks omitted).[3]  "Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision to discharge the plaintiff," and "[i]f the defendant meets its burden of production by offering a legitimate rationale in support of its employment decision, the burden shifts back again to the plaintiff to show that the defendant's proffered reasons were a pretext for discrimination." *Id.* at 979.

Defendants do not dispute on appeal that Ms. DeFreitas made out a prima facie case.  In turn, she does not dispute that Horizon offered nondiscriminatory reasons for her termination.  She does dispute, however, the district court's ruling that she failed to produce sufficient evidence to support a finding that Horizon's stated reasons were pretextual.

On this point, we agree with Ms. DeFreitas.  Our above discussion of Ms. DeFreitas's FMLA claim noted the credibility problems that could undermine Defendants' account of the reasons for termination.  *See Turner v. Pub. Serv. Co.*

[3] In assessing whether Ms. DeFreitas made out a prima facie case, the district court and the parties employed a standard requiring proof that "'(1) she is a member of a protected class; (2) she was qualified to perform her job; (3) despite her qualifications, she was discharged; and (4) the job was not eliminated after her discharge.'"  Aplt. App. Vol. C at 1243 (quoting *Lyons v. Red Roof Inns, Inc.*, 130 F. App'x 957, 960 (10th Cir. 2005)).  That standard, as we have previously observed, is not suitable for a religious-discrimination claim brought against members of a minority religion.  *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1038 (10th Cir. 1993).

-26-

*of Colo.*, 563 F.3d 1136, 1143 (10th Cir. 2009) ("A claim of pretext . . . may be based on weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's claimed legitimate, non-discriminatory reason such that a rational trier of fact could find the reason unworthy of belief." (internal quotation marks omitted)).

Nevertheless, we affirm the summary judgment on this claim. In the course of ruling that Ms. DeFreitas had failed to present sufficient evidence of pretext, a ruling with which we disagree, the district court also ruled that she had failed to present sufficient evidence of the intent necessary for religious discrimination. With that ruling we agree.

"[I]t is not *always* permissible for the factfinder to infer discrimination from evidence that the employer's explanation is unworthy of belief." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1168 (10th Cir. 2007). As the Supreme Court has stated, "[T]here will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000). "For instance," it explained, "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and

there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* Factors to be weighed "include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." *Id.* at 148–49.

Our opinion in *Swackhammer* is instructive. Swackhammer, a female vice president of Sprint, was terminated by the company's senior vice president, Castanon, after he received complaints that she had engaged in unethical behavior. *See* 493 F.3d at 1163–65. But another vice president, Winters, a male who was the subject of similar allegations, was not terminated. *See id.* at 1171. Swackhammer claimed gender discrimination. Sprint contended that the reason for the different treatment of Swackhammer and Winters was that her violations were more severe. *See id.* We acknowledged that there was a genuine issue of fact concerning the truth of this contention. But the only alternative explanation supported by the record was that Castanon treated Winters more leniently because the two were friends. *See id.* at 1172. Thus, either Swackhammer was treated more harshly than Winters because her misdeeds were worse or because Castanon favored a friend, which "while perhaps unfair, was similarly nondiscriminatory." *Id.* We therefore affirmed summary judgment in favor of the company.

Turning to this case, Ms. DeFreitas has argued that religious discrimination is shown by the following: (1) other Catholic staffers were fired; (2) Marina

-28-

Palmer, who was promoted to regional manager despite her reputation for swearing at employees, was LDS; (3) religious discussion permeated the workplace; and (4) Mr. Terry (a) provided her with religious literature, (b) joked about converting her to the LDS Church, (c) commented that an employee was a "good Mormon girl," when noting that she, unlike Ms. DeFreitas, did not return to the workplace after having a child, (d) often commented that former LDS missionaries made good salespeople, and (e) referenced "Ecclesiastes 3" in her termination email.

Although this evidence could suffice to demonstrate a prima facie case, most of it is quite weak. Ms. DeFreitas, for example, provides no evidence of the circumstances surrounding the firing of the other Catholic staffers. For all the record shows, they could have been terminated for cause. Nor has she provided any evidence to contradict Mr. Terry's statement that he promoted Palmer only after she stopped cursing. And she gives almost no specifics about religious discussion in the workplace (other than her conversations with Mr. Terry).

The remaining evidence relates to Mr. Terry. Some is of questionable relevance. Ecclesiastes is a holy book to Catholics as well as to the Church of Jesus Christ of Latter-day Saints. And even if Mr. Terry frequently discussed his religion with Ms. DeFreitas, she did not contradict his testimony that it was she who initiated religious conversations. But regardless of whether Mr. Terry's remarks can be interpreted as displaying partiality to members of his faith, it

would not be reasonable to draw an inference that he fired Ms. DeFreitas because of her religion.  The uncontradicted evidence is that her Catholicism was known throughout her tenure with Horizon, yet Mr. Terry had treated her well.  In some 21 months he had given her two raises—the second of which was more than a 1/3 increase in salary—and had given her praise as well as increasing responsibilities.  Ms. DeFreitas points to nothing with religious overtones that occurred during her final months with Horizon that could account for any religious animosity by Mr. Terry toward her.  In light of this history, it simply beggars the imagination to believe that she was fired on religious grounds.  *See Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 361–62 (7th Cir. 2001) (age-discrimination claim rejected because "it is eminently reasonable to doubt that . . . a worker hired at an age well beyond that at which the protections of the age discrimination law click in and terminated *within months*, that is, before he is appreciably older, was a victim of age discrimination.  A company that didn't want 54-year-olds on its payroll would be unlikely to hire one rather than to hire one and promptly fire him." (citations omitted)).  The only plausible grounds are the reasons proffered by Defendants and her lengthy absence from work.  Accordingly, her religious-discrimination cannot go forward.

## IV.    CONCLUSION

We REVERSE the summary judgment in favor of Defendants on Ms. DeFreitas's FMLA interference claim and REMAND for further proceedings.

We AFFIRM the district court's grant of summary judgment with respect to her religious-discrimination claim.