**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 26, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

KRIS OLSON,

      Plaintiff - Appellant,

v.

PENSKE LOGISTICS, LLC,

      Defendant - Appellee.

No. 15-1380

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:14-CV-03098-MEH)**
_____

Scot C. Kreider (Sara A. Green with him on the briefs), of Bachus & Schanker, Denver, Colorado, for Plaintiff–Appellant.

Cynthia K. Springer of Faegre Baker Daniels, Indianapolis, Indiana (Thomas W. Carroll of Faegre Baker Daniels, Denver, Colorado, with her on the briefs), for Defendant–Appellee.
_____

Before **BRISCOE**, **McKAY**, and **BALDOCK**, Circuit Judges.
_____

**McKAY**, Circuit Judge.
_____

    Kris Olson managed a warehouse for Penske Logistics, but Penske fired him while he was on medical leave. He filed suit under the Family and Medical Leave Act (FMLA), alleging Penske had unlawfully interfered with his FMLA rights.

Penske moved for summary judgment. It argued that Mr. Olson could not satisfy the third element of an FMLA interference claim: he could not show that his termination was "related to the exercise . . . of [his] FMLA rights," *Dalpiaz v. Carbon Cty.*, 760 F.3d 1126, 1132 (10th Cir. 2014). Because of his poor job performance, Penske argued, Mr. Olson would have been fired even if he had not taken leave. Penske's motion was granted, and Mr. Olson now appeals.

Mr. Olson contends summary judgment was inappropriate because there is enough evidence for a jury to believe his termination was related to his leave. For this argument to succeed, Mr. Olson must identify some "causal connection" between his leave and Penske's decision to fire him. *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1289 (10th Cir. 2007). Mr. Olson identifies two. A reasonable jury could find, he argues, that if he had not taken leave, he would have been able to defend his job performance and persuade Penske not to terminate him. And, he argues further, a reasonable jury could find he was really fired for taking leave when he was urgently needed at work.

We reject both of these arguments. While they might initially seem plausible, neither of them survives close contact with the facts.

## BACKGROUND

Penske hired Mr. Olson in 2002. He started out as a dispatcher, with no subordinates, but over the next ten years he was promoted three times. By 2013 he was the Operations Manager of Penske's Denver warehouse and responsible for everything that went on there: hiring, financial records, moving and tracking

– 2 –

inventory, regular inventory audits, and so on.  He supervised "approximately 30 or 34" Penske employees.  (Appellant's App. at 115.)

Initially, his performance seemed adequate.  His 2013 performance review gave him mostly "3" grades on a 5-point scale, indicating "Successful Performance" but not "Highly Successful Performance" or "Exceptional Performance." (*Id.* at 85–92.)  He received "2" grades—meaning "Inconsistent Performance"—in four categories:  communication, team building, efficiency, and achieving results. (*Id.* at 86–88.)  Mr. Olson's supervisor, Rick Elliott, gave the following recommendation about Mr. Olson's future with Penske:  "Kris needs to continue working as an Operations Manager or something similar for [2014]. He has performed well [in 2013], but needs to continue his training in his present position."  (*Id.* at 92.)

2014 did not go as planned.  In January, Mr. Olson received his first formal discipline from Penske, a written warning reprimanding him for not firing a worker who had violated safety rules.  The warning advised Mr. Olson, "In the future your failure to properly follow procedures will result in more severe disciplinary action up to and including discharge." (*Id.* at 198.)

"More severe disciplinary action" happened in June.  It was prompted by an email from Mr. Olson to Mr. Elliott:  "We are in need of lift operator support. . . .  Is there anyone in the region that could help us out with 3–4 operators?"  (*Id.* at 55–56.)

Mr. Elliot responded incredulously:  "Kris I am shocked to receive this email and you telling me you need 3 to 4 people from other regions.  I have been pushing you hard for the past 6 months to get people hired . . . ."  (*Id.* at 54.)  He encouraged

Mr. Olson to be creative and cut corners if necessary in order to get the warehouse caught up: "Maybe you skip cycle counts [i.e., inventory audits], or reduce them. Start thinking through this." (*Id.*) He later met with Mr. Olson and put him on a 60-day "action plan," which instructed Mr. Olson to hire more workers, process inventory more quickly, and respond promptly to phone calls and email. (*Id.* at 57.) The action plan concluded with the following warning: "Failure to meet and maintain all requirements will result in your immediate termination of employment." (*Id.*)

Mr. Olson did as instructed, and Mr. Elliott soon emailed him some encouragement: "At this time you have been meeting all the requirements of your action plan. Please continue that kind of performance and you will be successful." (*Id.* at 58.) So far as we know, this was the last performance review Mr. Olson received before he requested FMLA leave on July 9. His leave was eventually approved, and his last day at the warehouse was Friday, July 18.

July 18 was also the first day of the inventory crisis that cost him his job.

Inventory control was one of Mr. Olson's responsibilities—he was expected to keep accurate inventory records and prevent inventory losses. Every week he presented an inventory report to Whirlpool, Penske's customer for whom he did nearly all of his work. Every month Whirlpool graded the warehouse on a scale from A to F, depending on how much of Whirlpool's inventory had been lost. And from January through May of 2014, Whirlpool gave the warehouse an A.

But on July 18, Mr. Elliott received the warehouse's grade for June: a D. He asked Nicki Brurs, a supervisor at another warehouse, to travel to Denver to investigate. When Ms. Brurs arrived the following week, she discovered a situation that even Mr. Olson now refers to as a "crisis." (Reply Br. at 20.) The warehouse's inventory reconciliation report—a list of known discrepancies between the warehouse's records and its actual inventory—was 152 lines long, with some discrepancies dating all the way back to June.[1] The warehouse had done only 37 random audits "over the last months," and when Ms. Brurs arrived the warehouse was 567 audits behind schedule. (Appellant's App. at 209.)

"We will have an inventory loss here," Ms. Brurs emailed Mr. Elliott, "but I honestly cannot say or even lean to [sic] how much I think it will be. There are too many holes in the inventory." (*Id.* at 210.) As to the reason for the crisis, Ms. Brurs was more confident. "There looks to be a lack of processes and training. Everyone relied on [Mr. Olson] for everything." (*Id.*)

Soon Mr. Elliott became aware of a further problem with Mr. Olson's performance: dishonesty. In his last months on the job, Mr. Olson had not billed Whirlpool for extra work—"reworks"—performed by the warehouse. (*Id.* at 193.) Worried that Penske would not collect money it was owed, Mr. Elliott had asked Mr. Olson why he had not billed Whirlpool for reworks. Mr. Olson answered that there

---

[1] Mr. Olson's counsel asked Mr. Elliott about this report, "Did [any discrepancy in the report] jump out at you that it was really old?" (Appellant's App. at 443.) Mr. Elliott's colorful response: "Jiminy Christmas. I—I'm just thinking the enormity of it. The—it was over a hundred model . . . a hundred model numbers in variance. So that's what would have jumped out at me." (*Id.* at 443–44.)

had been no reworks to bill for. But on July 28, Mr. Elliott discovered there had been several reworks, and he concluded that Mr. Olson had lied to him.

By August 1, a week after receiving Ms. Brurs' email, Mr. Elliott had made up his mind. He sent a human resources representative, Vanessa Perry, a report summarizing the problems he had discovered, including more dishonesty. (*Id.* at 204.) According to Mr. Elliott, Mr. Olson had hidden inventory losses in a "ghost stow." (*Id.* at 441.) That is, Mr. Olson had created records for an imaginary storage location, and when he could not find inventory, he would assign it to the imaginary location so that Whirlpool would think it was still in the warehouse. The ghost stow had received its first "deliveries" in July of 2010; Mr. Olson had apparently been using it to hide losses for four years. (*Id.* at 204.) Finally, Mr. Olson had directed his staff not to tell Whirlpool when inventory was missing; instead he told them to report the missing units as damaged.

Mr. Elliott's recommendation was straightforward: "I understand that I cannot replace Kris while he is out on medical leave. What I want to do is bring in an [Operations Manager] as a temporary replacement, terminate Kris his 1st day back, 'if ever', from medical leave and then make the temporary [Operations Manager] permanent."[2] (*Id.* at 202.) Ms. Perry discussed this recommendation with Bruce Gruebner—the human resources official responsible for approving all terminations at Penske—and Mr. Gruebner agreed that Mr. Olson should be fired. According to Mr.

_____

[2] When asked about the words "if ever" in his email, Mr. Elliott testified he had been told by Denver warehouse employees that Mr. Olson did not plan to return to work after his leave.

Gruebner's affidavit, Mr. Olson's "numerous and substantial instances of poor performance were unacceptable and warranted termination." (*Id.* at 176.)

But Penske's investigation continued, and Mr. Olson was not fired for nearly two more weeks. First, Mr. Gruebner asked Ms. Perry to find out whether Mr. Olson was on approved FMLA leave. Ms. Perry asked another human resources employee about it, but for reasons not apparent from the record, she received the wrong answer. She was told Mr. Olson's leave had not been approved, and she forwarded that false information to Mr. Gruebner.

Second, Penske sent a "Loss Prevention team" to audit the warehouse more thoroughly. (*Id.* at 184.) After a week at the warehouse, the loss prevention team submitted a report describing still further problems with Mr. Olson's job performance. To begin with, it discovered that Mr. Olson had hidden losses in not just one ghost stow, but "roughly 26" ghost stows. (*Id.*) When his employees performed inventory audits, Mr. Olson told them to "back out" whenever they found an error—that is, instead of reporting the error directly to Whirlpool as policy required, they were supposed to interrupt their audit and tell Mr. Olson about the problem. (*Id.*) He would then correct the inventory error before the auditors finished, giving Whirlpool the false impression that there had been no errors to begin with. According to the loss prevention team, "This [was] an unacceptable practice of inventory and [Mr. Olson] was well aware of that." (*Id.*)

According to the loss prevention team's interviews with warehouse staff, Mr. Olson had not taught his employees basic inventory procedures. When they brought

– 7 –

inventory problems to his attention, he told them "not to worry about it, he would handle it," and then did nothing to help them deal with the situation. (*Id.* at 184–85.) The problems added up, and when the loss prevention team arrived, "the inventory [had] been out of order for at least a year." (*Id.* at 185.) Auditing only the warehouse's major appliances, the loss prevention team found more than $120,000 of errors in the warehouse's records and wrote off more than $41,000 of inventory losses.[3]

Finally, in addition to the inventory problems and dishonesty, Penske's investigation found numerous lesser failures in Mr. Olson's performance: failure to train his employees, failure to enforce attendance policies, failure to return damaged items to Whirlpool, and so on. On top of it all, all the investigators (incorrectly) believed that Mr. Olson had taken leave without approval. The loss prevention report concluded, "Kris has checked out of this facility and our recommendation would be immediate termination." (*Id.* at 186.)

The next business day, August 18, Penske sent Mr. Olson a letter informing him he had been fired. It reads in relevant part as follows:

> You currently are out of work on an unapproved leave of absence . . . .
> Additionally, in the weeks you have been out, an investigation has revealed
> several deficiencies and policy violations that clearly evidence
> unsatisfactory work performance on your part, all of which have apparently
> been going on for some time now.

---

[3] According to Mr. Elliott, the $41,000 loss "was almost completely eliminated" when Penske later audited the warehouse's minor appliances. (Appellant's App. at 529.) The minor-appliance records were nearly as wrong as the major-appliance records, but in the opposite direction—understating the warehouse's inventory, rather than overstating it.

> Due to the unapproved status of your leave of absence, coupled with a level of unsatisfactory job performance that cannot be tolerated, your employment with Penske is being terminated effective immediately.

(*Id.* at 188.)

On August 19, Mr. Olson called to tell Penske his leave of absence had in fact been approved.  On August 20, Penske sent him a final letter:

> Since sending our prior correspondence . . . , it has come to our attention that you applied and have been approved for a continuous leave of absence under the Family and Medical Leave Act ("FMLA") . . . .

> Because the severity of your performance issues and policy violations was not discovered until after you went out on leave of absence, in a spirit of fairness, if you so desire, we will rescind your termination and continue your employment as being on unpaid leave through October 19, 2014. . . .

> Once you have exhausted your FMLA entitlement on October 19, 2014, your employment would then be terminated.

(*Id.* at 190.)  Mr. Olson did not accept Penske's offer, and his termination remained in effect.  He was never told about the warehouse's inventory problems or given a chance to defend himself.

## ANALYSIS

Mr. Olson contends summary judgment was inappropriate because a jury could find his termination to be related to his leave.  In order for this argument to prevail, Mr. Olson must do more than list inferences that the district court should arguably have drawn in his favor.  He must identify facts that "establish a causal connection

between [his] termination and [his] FMLA leave."[4] *Campbell v. Gambro Healthcare, Inc.*, 458 F.3d 1282, 1289 (10th Cir. 2007). Mr. Olson seeks to establish two such connections.

First, Mr. Olson argues that if he had not taken leave, he would have been at work and able to defend his job performance. He could perhaps have argued that some of the problems were actually the fault of his inventory clerk, who left work suddenly a few days before he did. He could perhaps have blamed some of his inventory problems on Mr. Elliott's instruction to "skip" or "reduce" inventory audits while he was understaffed. Had he not been on leave, he claims, he might have been able to make arguments like these and save his job.

Second, quoting one of our cases, Mr. Olson argues that he was actually fired because he was "missing too much work" while on leave. *DeFreitas v. Horizon Inv. Mgmt. Corp.*, 577 F.3d 1151, 1161 (10th Cir. 2009). His absence (he says) came at a terrible time for his employer. He left the Denver warehouse in the middle of an inventory crisis, and consequently Ms. Brurs and Mr. Elliott were forced to travel to Denver to do his work. Mr. Elliott spent over a month there, flying out for "a couple of weeks" at a time and returning home only for occasional weekends. (Appellant's App. at 482.) Mr. Elliott may have resented the extra travel, feeling that Mr. Olson had "abandon[ed] the foxhole" when his help was badly needed. (Reply Br. at 25.)

---

[4] We therefore reject Mr. Olson's numerous arguments that allege errors in the district court's reasoning but do not explain how those errors relate to causation.

Because he resented Mr. Olson's absence—Mr. Olson argues—Mr. Elliott tried from the beginning to get Mr. Olson fired and replaced. He started right away. When he found out about the warehouse's D grade, he did not discuss it with Mr. Olson, even though Mr. Olson had not yet begun his leave.[5] Then, within two weeks of Mr. Olson's departure, Mr. Elliott recommended his termination and asked to hire a replacement immediately. Once Mr. Olson had been terminated, Mr. Elliott did in fact hire a replacement and stopped traveling so much to Denver. The suspicious timing of these developments, Mr. Olson argues, has "significant probative force," *DeFreitas*, 577 F.3d at 1160, especially since Mr. Olson's performance problems were not documented until after he requested leave.

Each of these arguments seems plausible, but neither of them has enough support in the record to create a genuine dispute of material fact.

Mr. Olson argues that, but for his leave, he would have had a chance to defend his conduct and save his job. But he cites no evidence that he would have been allowed to defend himself, or that any defense could possibly have succeeded. By our read, the record suggests the opposite: he would not have been allowed to defend his conduct, and no defense could have succeeded. In particular, we note Mr. Elliott and Mr. Gruebner's unchallenged declarations that they are "not aware of any

---

[5] Mr. Elliott testified that he did in fact discuss the D grade with Mr. Olson. But Mr. Olson testified that he was not informed about any of the performance problems that led to his termination. For present purposes, we resolve this dispute in Mr. Olson's favor.

employee who has been found to have the same level of unsatisfactory performance as Mr. Olson but who was not discharged." (*Id.* at 179, 195.)

Mr. Olson argues that Mr. Elliott and other Penske employees resented his absence and wanted to fire and replace him simply because he was missing work. But as to Mr. Elliott, there is no evidence that he considered himself inconvenienced: travel was an ordinary part of his job. Even if he did feel inconvenienced, there is no evidence that his inconvenience contributed to his recommendation: according to his uncontroverted affidavit, his recommendation was "based on poor performance, including the [inventory issues] and the reimbursement requests Mr. Olson lied to me about." (*Id.* at 194.) And even if Mr. Elliott's inconvenience did contribute to his own recommendation, there is no evidence that it contributed to the loss prevention team's recommendation or to Mr. Gruebner's ultimate decision to fire Mr. Olson.

As to the other Penske employees who supposedly resented Mr. Olson's absence and wanted him replaced, Mr. Olson does not even tell us who they are.

In short, Mr. Elliott and Mr. Gruebner both affirm that Mr. Olson was not terminated because of his leave, but rather because of "numerous and substantial instances of unsatisfactory performance." (*Id.* at 179, 195.) Nothing in the record would allow a reasonable jury to doubt their word.

## CONCLUSION

The record contains substantial, unchallenged evidence of Mr. Olson's poor job performance. Even Mr. Olson admits that Mr. Elliott "honestly believed" the warehouse's problems were Mr. Olson's fault. (Reply Br. at 24.) Mr. Gruebner and

– 12 –

Ms. Brurs have sworn they believed likewise, and Mr. Olson presents no evidence that they did not.

There is also substantial, unchallenged evidence that Mr. Olson's poor performance led to his termination.  The record shows step by step how his misconduct was discovered, how Penske's employees reacted to it, and why they ultimately decided to fire him.  There are no holes, no conflicting statements, simply nothing that indicates inaccuracies in Penske's story.  No evidence suggests that Mr. Olson could possibly have kept his job once his misconduct was discovered, and two affiants insisted the opposite is true—they are "not aware of any employee who has been found to have the same level of unsatisfactory performance as Mr. Olson but who was not discharged." (*Id.* at 179, 195.)

Mr. Olson's arguments, even the strongest ones, simply ignore all of this.  Instead of confronting Penske's facts, Mr. Olson speculates about facts not in evidence.  Instead of grounding his stories in the record, Mr. Olson insists we must believe them simply because we are considering a summary judgment motion and he is the non-moving party.

The rules of summary judgment cannot be pushed so far.  The district court's judgment is **AFFIRMED**.